T.C. Memo. 2002-9

UNITED STATES TAX COURT

DALE A. RINEHART AND JEANA L. YEAGER, f.k.a. JEANA L. RINEHART,
ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20185-98, 15968-99,      Filed January 9, 2002.
15969-99, 7007-00.

Frank C. Hider, for petitioners.

Stephen W. Brower, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined deficiencies in and
penalties on petitioners' Federal income taxes as follows:

--------------------------------------------------------

[1]  Cases of the following petitioners are consolidated
herewith:  Jeana L. Yeager, docket No. 15968-99; Dale A.
Rinehart, docket No. 15969-99; Jeana L. Yeager, docket No. 7007-
00.

| Docket No. | Year | Deficiency | Penalty Sec. 6662 |
|------------|------|------------|-------------------|
| 20185-98 | 1994 | $46,894 | $9,379 |
| 15968-99 | 1995 | 29,264 | 5,853 |
| 15969-99 | 1995 | 28,765 | 5,753 |
| 15969-99 | 1996 | 53,869 | 10,774 |
| 7007-00 | 1996 | 27,032 | 5,406 |

The issue addressed in this opinion is whether petitioner Dale A. Rinehart's (Mr. Rinehart) horse breeding activity was an activity not engaged in for profit for 1994, 1995, and 1996. (A separate opinion will address the issues, previously tried and briefed, of whether petitioner Jeana L. Yeager had cancellation of indebtedness income for 1995, whether petitioner Jeana L. Yeager is entitled to relief pursuant to sections 66[2] or 6015, and whether petitioners are liable for penalties pursuant to section 6662(a).)

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the stipulation of settled issues,[3] and the attached exhibits are incorporated herein by this reference. At the time they filed the petitions, petitioners resided in Campbell, Texas.

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3] All concessions by the parties are accepted by the Court, and they will be incorporated into the decisions to be entered when all other issues are resolved.

## Cattle Activities

Around 1969, Mr. Rinehart purchased a ranch southwest of Celina, Texas (Celina ranch), for $800 per acre. At this time, he also purchased a number of polled[4] Hereford cattle. Mr. Rinehart intended to breed registered polled Herefords and build up a herd of cattle (polled Hereford breeding activity). In 1971, he sold the Celina ranch for $1,600 per acre. He also sold his herd of polled Herefords for a profit.

In 1971, Mr. Rinehart purchased a ranch in Van Alstyne, Texas (Van Alstyne ranch). He bought the Van Alstyne ranch because it was larger and had better facilities for raising cattle than the Celina ranch. At this time, Mr. Rinehart also purchased a herd of registered Herefords.

In 1971 or 1972, Mr. Rinehart began a Hereford breeding activity on the Van Alstyne ranch. In 1977, when his bull died, he ended the Hereford breeding activity. Even though the Hereford breeding activity was profitable overall, Mr. Rinehart decided not to continue the Hereford breeding activity because the cattle market was declining.

## Initial Horse Activity

In 1978, Mr. Rinehart and his then wife Donna Jean Rinehart[5] got into the quarter horse industry (initial horse activity).

---

[4] "Polled" Herefords have no horns.

[5] Around 1978, Mr. Rinehart married Donna Jean Rinehart.

Mr. Rinehart chose to specialize in cutting horses because it was the part of the quarter horse industry that was most familiar to him.  Mr. Rinehart had been involved with cutting horses since he was 7 years old and had used cutting horses in his cattle activities.  Prior to 1978, Mr. Rinehart had received training about cutting horses from various trainers.

In 1978, Mr. Rinehart's business plan for the initial horse activity was to purchase "foundation bred"[6] broodmares for breeding to outside stallions until he accumulated a herd of approximately 20 broodmares.  At that time, he also would buy young stallions, train them, show them to build their names, and breed them to his own broodmares.

In 1981 or 1982, Mr. Rinehart attended a cutting horse seminar taught by two of the top National Cutting Horse Association (NCHA)[7] riders of all time.  He attended this seminar to further his education and his ability to train and show cutting horses in competitions.  Mr. Rinehart was trained on how to cut cattle, on proper techniques, on principles of cutting, and how to train horses to be performance cutting horses.

---

[6]  A foundation bred horse is a horse descended from the first horses registered with the American Quarter Horse Association (AQHA).

[7]  During the years in issue, Mr. Rinehart was a member of the NCHA.

Divorce, Bankruptcy, and End of the Initial Horse Activity

In 1986, Mr. Rinehart and Donna Jean Rinehart divorced. As a result of the divorce, Donna Jean Rinehart received 27 of the horses they owned. These 27 horses included the best broodmares.

Also during the mid-1980s, Mr. Rinehart filed for bankruptcy. In 1986, Bedford National Bank seized and sold by judicial foreclosure 21 of Mr. Rinehart's horses, and MBank Sherman, N.A., foreclosed upon and later sold 18 of Mr. Rinehart's horses. In 1986, after the divorce and foreclosures, Mr. Rinehart ended the initial horse activity.

Startup of New Horse Breeding Activity

In 1990, Mr. Rinehart decided to start another cutting horse activity (the horse breeding activity). Mr. Rinehart leased an arena in Royce City, Texas, to train the few horses he still owned after the divorce and foreclosures. In 1991, he purchased a ranch in Campbell, Texas (Campbell ranch), for $350,000. Mr. Rinehart moved to the Campbell ranch because it was a "full service facility" for a horse breeding and training operation--it had an indoor arena, stallion barn, breeding facilities, and a training area. Additionally, the Campbell ranch had cross pastures, cross fences, and "special use facilities". Another reason Mr. Rinehart moved to the Campbell ranch was that it was a high visibility property--the Campbell ranch was located alongside a divided highway that was the main artery between

Tulsa, Oklahoma, and Houston, Texas.

Mr. Rinehart erected a promotional sign outside the front entrance of the Campbell ranch. The sign had the horse breeding activity's phone number and advertised his two premier stallions. It also had a fiberglass horse on the top of it that was painted to match the color of one of his premier stallions.

Mr. Rinehart had a business plan for the horse breeding activity. Instead of relying on young stallions that did not have established reputations and attempting to build a name for them, as in the initial horse activity, Mr. Rinehart purchased higher quality stallions with established breeding records that matched up to the bloodlines/lineages in his broodmares. He bred these horses to one another, rather than using outside stallions, and also bred his stallions with outside mares.

At the time he purchased the Campbell ranch, Mr. Rinehart purchased a champion cutting horse stallion, named Smooth Herman, as the foundation for the horse breeding activity. Smooth Herman had sired several champion offspring and had won several cutting horse champion titles.

Mr. Rinehart planned to breed Smooth Herman daughters to a son of Doc Bar.[8] Crossing a Doc Bar son with a Smooth Herman

---

[8] Doc Bar was a prominent horse in the cutting horse industry. He was the number one paternal grandsire and number two maternal grandsire of all time.

daughter resulted in an "outcross".[9]  Mr. Rinehart was outcrossing these two bloodlines in an attempt to get "hybrid vigor".[10]

After researching the market, in 1992 Rinehart purchased a stallion named Doc City.  Doc City was the second youngest then existing son of Doc Bar.

After inserting Doc City into his breeding program, Mr. Rinehart discovered that his mares were not getting pregnant because Doc City had a breeding problem (he was not ejaculating semen into the mares).  This was unexpected because over the previous 13 years Doc City sired approximately 85 horses.

Mr. Rinehart sought advice from veterinary experts at the University of Pennsylvania and the University of Colorado-- universities which had done extensive breeding research.  Mr. Rinehart decided to have Doc City evaluated by the University of Pennsylvania.  The University of Pennsylvania determined that Doc City could only be used for very limited breeding.  In fact, Doc City produced only two foals for Mr. Rinehart before the horse

---

[9]  In the cutting horse industry, there are prominent traits associated with certain bloodlines/lineages.  In attempting to improve the breed, horses descended from different bloodlines with complementary traits are mated.  This is termed "outcrossing".  The purpose of outcrossing is to mate one horse with desired traits to another horse with different desired traits so the resultant offspring will have traits superior to its parents (the sire and dam).

[10]  Hybrid vigor results in the best of both bloodlines in the foal.

died in 1997.

While Doc City was being evaluated, Mr. Rinehart attempted to replace Doc City with another son of Doc Bar.  By that time, however, all of Doc Bar's sons were too old to be used effectively in Mr. Rinehart's breeding program.  Therefore, Mr. Rinehart decided to purchase a grandson of Doc Bar named Makingyourmark.

Makingyourmark was a son of Doc O'lena and Bar Socks Babe.  Doc O'lena was the most predominant producing son of Doc Bar, and Bar Socks Babe was one of the top ten producers of cutting horses.

Horse Breeding Operations

Horse breeding is difficult work.  During the years in issue, Mr. Rinehart:  (1) Mucked (cleaned out) stalls, (2) cut, bailed, and hauled hay, (3) performed minor surgery on his horses, (4) fixed leaky pipes, and (5) checked the stallions, mares, and foals on a daily basis for injuries and illnesses so that they could be treated immediately.[11]

Mr. Rinehart, as part of his planned breeding program, determined which stallion to breed to which mare approximately 1 year in advance.  He based his decisions on the horses' bloodlines and past breeding performance.

---

[11] Mr. Rinehart had blood testing equipment on site so he could diagnose and treat illnesses quickly.

Horse Breeding Methods:  Live Cover and Artificial Insemination

From 1991 through 1994 or 1995, the breeding method used by Mr. Rinehart was "teasing" the mares (to determine which mares were in heat) and doing "live cover" (where the stallion and mare have intercourse).  Mr. Rinehart had a special facility on the Campbell ranch for teasing the mares.

Around 1994, Mr. Rinehart started using artificial insemination breeding.  Mr. Rinehart gained knowledge of equine artificial insemination techniques through studying, reading books, and working with veterinarians while they performed artificial insemination.

After learning about equine artificial insemination, Mr. Rinehart purchased artificial insemination equipment.  Mr. Rinehart had the following equipment on the Campbell ranch for use in his artificial insemination breeding program:  (1) Horse stocks that could be used to palpitate several mares at a time, (2) a phantom mare (also known as a dummy mare) with an artificial vagina that was used to collect the stallions' semen, (3) a laboratory, (4) incubators, (5) a microscope, (6) a refrigerator, and (7) cryogenic equipment.

Artificial insemination made it possible for his stallions to breed with more mares than when Mr. Rinehart used live cover. As part of his artificial insemination program, Mr. Rinehart set up a detailed schedule for use during breeding season showing

when to collect his stallions' semen.  This allowed him to maximize the opportunity to fertilize his mares.[12]

In the fall of 1996, Mr. Rinehart met Dr. John Allen, a practicing veterinarian for 30 years and specialist in equine reproduction.[13]  After some discussions, Mr. Rinehart decided to have Dr. Allen work at the Campbell ranch.  At this time, the artificial insemination program included sonograms performed by Dr. Allen.  The sonograms allowed Mr. Rinehart to determine better when the mares were ready for breeding and whether they were pregnant.  Since Dr. Allen joined Mr. Rinehart's horse breeding activity, the pregnancy rate of Mr. Rinehart's breeding program increased from a rate of 40 to 45 percent to a rate of 85 to 90 percent.

The Horse Breeding Activity's Records

Mr. Rinehart maintained a ledger with handwritten monthly expenses of the horse breeding activity until January 1994. Starting in 1993, Mr. Rinehart began keeping records for the horse breeding operation on a computer.  Mr. Rinehart kept a register report, cash-flow report, itemized category report,

_____

[12]  Mr. Rinehart's mares were in heat between 7 and 9 days. The stallions' semen lives only 48 hours after ejaculation. Setting a schedule of when to collect semen and inseminate the mares allowed him to maximize the chances of fertilization.

[13]  Dr. Allen's expertise in equine breeding included such areas as fertility, sterility, normal breeding management, artificial insemination, and embryo transfers.

chart of monthly income and expenses, and tax summary report. These records detailed the date of each transaction, the check number, a description of the payee, the category of the expense, and the amount of the expenses. There was also a space to write additional notes regarding the expense.

During the years in issue, Mr. Rinehart also kept computerized records of foaling dates. The foaling records listed the name of the mare and stallion mated, the breeding dates, the due date, the birth date, the color, the lineage, and the sex of each foal. There was also a space for comments. Mr. Rinehart also kept records of planned breeding of stallions with specific mares.

Additional computerized records kept by Mr. Rinehart for the years in issue include records of the horses purchased, sold, and that died, and records of the maintenance[14] performed on each of his horses broken down by stallions, mares, and geldings.[15]

Before, during, and after the years in issue, Mr. Rinehart prepared and filed with the American Quarter Horse Association (AQHA)[16] stallion breeding reports for his stallions. He also

[14] The "maintenance" performed on the horses included shoeing, worming, giving inoculations, trimming hoofs, and floating teeth.

[15] The maintenance records also contained the lineage/pedigree of each horse.

[16] During the years in issue, Mr. Rinehart was a member of the AQHA.

maintained a stallion breeding file for his own records. This file contained a copy of the AQHA stallion breeding report, breeding schedules, monthly breeding reports by stallion and mare (broken down by stallions he owned, mares he owned, and outside mares), and equine breeding records for each mare broken down by day and month for each breeding season.

Mr. Rinehart maintained a separate file, broken down by horse, for each of the horses he owned. These files contained earnings reports, show records, racing records, sire's get records, registration records, pedigree/lineage records, news articles, veterinary records, advertisements, notes, invoices, and purchase and sale records.

Mr. Rinehart used standardized forms that are used in the horse breeding industry. These included stallion breeding contracts, training contracts, mare foaling reports, AQHA stallion breeding reports, AQHA registration applications, AQHA transfer reports, and AQHA lease authorization forms. The stallion breeding contract outlined the breeding procedures and what was expected from the client and Compass R Ranch.[17]

Mr. Rinehart maintained files for his breeding and training contracts. Additionally, Mr. Rinehart provided copies of the contracts to the clients. Within these files, Mr. Rinehart

---

[17] Mr. Rinehart operated the horse breeding activity under that name "Compass R Ranch".

maintained invoice records that include the breeding record, maintenance records for the horse of each client, and forms indicating compliance with Coggins testing.[18]

Mr. Rinehart also maintained the following files:  Feeds Info (which included nutritional information), Semen Log, Reproduction Info (which included breeding and artificial insemination materials), Bayer Eav-1 Vaccine (which included breeding and medical materials), Stall Panels = Priefert Mfg. Co. Inc. (which included invoices for horse breeding equipment), and Manure Spreader-Hesston.

Mr. Rinehart also kept extensive records regarding his artificial insemination program.  Additionally, Mr. Rinehart built a database on his mares' breeding habits.

Additional Resources

Mr. Rinehart's library of books included breeding and genetics books, AQHA rules and regulations, veterinary books, management and efficiency books, foaling books, and therapy and rehabilitation books.  Some of his books also dealt with the economic aspects of horse businesses.

Mr. Rinehart consulted with experts on various aspects of the horse breeding business including showing, breeding, and selling the horses.  Over the years, Mr. Rinehart hired professional trainers to train his horses.

_____

[18]  This tests for equine sickness.

Additional Background

Mr. Rinehart advertised the horse breeding activity in trade publications, local horse association publications, and at horse shows. Mr. Rinehart gave away baseball caps, pens, and other promotional items with the Compass R Ranch name on it. Mr. Rinehart wore to horse shows jackets embroidered with the logo of the Compass R Ranch and with the names of his stallions. Mr. Rinehart wrote articles to publicize the Compass R Ranch.

Mr. Rinehart had stationery and business cards that bore the name Compass R Ranch.

From 1991 through 1999, Mr. Rinehart did not show many of his horses; instead, he concentrated on building up a broodmare band and increasing his stock of offspring of each stallion. That way he had an inventory of horses of varying ages and pedigrees to sell in order to provide purchasers with a variety of choices. As part of the horse breeding activity, Mr. Rinehart also culled some of his horses.

During the years in issue, Mr. Rinehart sold seven horses. This was an increase from the previous years, 1991 through 1993, when he sold no horses. Mr. Rinehart sold his horses for the following total amounts: $2,441 in 1994, $4,945 in 1995, $5,960 in 1996, $14,929 in 1997, and $15,360 in 1998.

During the years in issue, Mr. Rinehart was a pilot. He worked an average of only 5 days a month. On December 1, 2000,

at age 60,[19] he retired.  One of the reasons Mr. Rinehart started the horse breeding activity was to have a source of income during his retirement, which he anticipated to be in 2000, or in case he lost his job before he retired.

OPINION

Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b). Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

The U.S. Court of Appeals for the Fifth Circuit, to which an appeal in this case would lie, has held that for a deduction to be allowed under section 162 or section 212(1) or (2), a taxpayer must establish that he engaged in the activity with the primary purpose and intent of realizing an economic profit independent of tax savings.  Westbrook v. Commissioner, 68 F.3d 868, 875 (5th Cir. 1995), affg. T.C. Memo. 1993-634.

The expectation of profit need not have been reasonable; however, the taxpayer must have entered into the activity, or continued it, with the objective of making a profit.  Hulter v.

_____

[19]  Age 60 was the mandatory retirement age.

Commissioner, 91 T.C. 371, 393 (1988); sec. 1.183-2(a), Income Tax Regs.

Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's mere statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs. Petitioners have the burden of proof. Rule 142(a).[20]

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, from the

---

[20] Cf. sec. 7491(a), effective for court proceedings arising in connection with examinations commencing after July 22, 1998. Petitioners do not contend that their examination began after July 22, 1998, or that sec. 7491 is applicable to their case.

activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  This list is nonexclusive, and the number of factors for or against the taxpayer is not necessarily determinative, but rather all facts and circumstances must be taken into account, and more weight may be given to some factors than to others.  Id.; cf. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).

As an initial matter, respondent contends that Mr. Rinehart's testimony regarding the horse breeding activity was not credible and that his "uncorroborated" testimony should be disregarded.  We disagree.  Other witnesses corroborated Mr. Rinehart's testimony regarding the horse breeding activity.  We found Mr. Rinehart's testimony regarding this particular issue to be credible.[21]

Manner in Which the Activity Is Conducted

The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit objective.  Sec. 1.183-2(b)(1), Income Tax Regs.  The evidence established that Mr. Rinehart kept complete and accurate books and records and that he operated the horse breeding activity in a businesslike manner.

Mr. Rinehart had a business plan for the horse breeding

---

[21]  This does not mean we find Mr. Rinehart's testimony regarding other issues presented in this case to be credible.  We make no such finding herein.

activity.  See Phillips v. Commissioner, T.C. Memo. 1997-128 (holding that a business plan need not be in written form and can be evidenced by the taxpayer's actions).  When he began the horse breeding activity, Mr. Rinehart moved from the Van Alstyne ranch, which was set up for raising cattle, to the Campbell ranch, which was set up for horse breeding and training.  Mr. Rinehart kept a library of books on the Campbell ranch to have at his disposal. He advertised and publicized the horse breeding activity.

Changing operating methods or adoption of new techniques in a manner consistent with an intent to improve profitability may also indicate a profit motive.  Sec. 1.183-2(b)(1), Income Tax Regs.  During the years in issue, Mr. Rinehart changed his breeding program from live cover to artificial insemination. This made it possible for his stallions to breed with more mares and for him to maximize the opportunity to fertilize his mares. This provided Mr. Rinehart with additional horses to sell and/or breed.

We conclude that this factor indicates that petitioners had the requisite profit motive.

Expertise of Mr. Rinehart and His Advisers

A taxpayer's expertise, research, and study of an activity, as well as his consultation with experts, may be indicative of a profit intent.  Sec. 1.183-2(b)(2), Income Tax Regs.  Respondent concedes that Mr. Rinehart has extensive expertise in horse breeding.  Mr. Rinehart consulted with experts on various aspects

of the horse breeding business including showing, breeding, and selling the horses. Over the years, he hired professionals to train his horses. When Doc Bar was not producing foals, Mr. Rinehart sought advice from veterinary experts and had the stallion evaluated by experts. In 1996, Mr. Rinehart added the services of a specialist in equine reproduction, Dr. Allen, to the horse breeding activity. We conclude that this factor is indicative of the requisite profit motive.

Time and Effort Expended by Mr. Rinehart

Mr. Rinehart was engaged in all aspects of the horse breeding activity including: (1) Hiring and firing all labor, (2) purchasing of mares and stallions, (3) breeding and raising the horses, (4) training of the horses, (5) culling the horses, (6) maintaining the horses, (7) advertising the activity, and (8) promoting the activity. Respondent concedes that Mr. Rinehart spent significant amounts of time in carrying on the horse breeding activity. This factor is indicative of the requisite profit motive.

The Expectation That Assets May Appreciate in Value

A number of experts testified at trial. Internal Revenue Service (IRS) real estate appraiser Armando Rodriguez concluded that as of December 31, 1996, the value of the Compass R Ranch was $406,000. Paul Bierschwale, a real estate appraiser, concluded that as of December 31, 1996, the value of the Compass R Ranch was $500,000. Respondent argues that we should accept

the valuation proposed by Mr. Rodriguez; petitioner argues that we should accept the valuation proposed by Mr. Bierschwale. Both reports, however, conclude that by the close of the last taxable year in issue (1996) the Campbell ranch increased in value from its purchase price. The only dispute between the parties is to whether value increased by $56,000 or $150,000. The Campbell ranch increased in value by at least $56,000, and this supports Mr. Rinehart's expectation that the assets used in the activity would appreciate in value and petitioners' contention that the horse breeding activity was engaged in for profit.[22]

Additionally, IRS economist Roderick Moss testified that he thought Mr. Rinehart's horse breeding activity could be profitable in the future. Accordingly, we conclude that this factor favors petitioners for the years in issue.

Mr. Rinehart's Success in Similar or Dissimilar Activities

The uncontradicted evidence establishes that Mr. Rinehart enjoyed success in two previous cattle activities--the polled Hereford breeding activity and the Hereford breeding activity. This is indicative of the requisite profit motive.

History of Income or Loss

Mr. Rinehart incurred hundreds of thousands of dollars in

---

[22] We note that the parties submitted evidence regarding the valuation of petitioners' herd of horses. The factual and expert evidence, however, concerns the value of the horses in 2000--a year well beyond the years in issue.

losses from 1994 through 1996; however, in 1995 Mr. Rinehart reduced the amount of his losses from the horse breeding activity by approximately $25,000 from 1994, and in 1996 Mr. Rinehart again reduced the amount of his losses from the horse breeding activity by approximately $25,000 from 1995.

A record of substantial losses over several years may be indicative of the absence of a profit motive. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Section 1.183-2(b)(6), Income Tax Regs., however, provides that a series of losses during the startup phase of an activity may not necessarily be an indication that the activity is not engaged in for profit.

Mr. Rinehart admitted that during 1986 through 1989 he could not make a profit from the horses he owned. After the divorce and bankruptcy, he ended the initial horse activity and went into a "holding period" where he kept the few horses he still had, but he did not train, show, or breed them. In 1990, Mr. Rinehart reentered the cutting horse industry and started up the horse breeding activity.

This Court has recognized that the startup phase of a horse breeding activity is 5 to 10 years. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979). We believe that the years in issue, 1994 through 1996, encompassed a startup period. See Phillips v. Commissioner, supra; see also Engdahl v. Commissioner, supra at

669.  As Mr. Rinehart's losses were sustained during the startup phase of the horse breeding activity, we conclude that the losses sustained are not an indication that the horse breeding activity was not engaged in for profit.

Elements of Personal Pleasure

The absence of personal pleasure or recreation relating to the activity in question may indicate the presence of a profit objective.  Sec. 1.183-2(b)(9), Income Tax Regs.  The mere fact that a taxpayer derives personal pleasure from a particular activity does not, per se, demonstrate a lack of profit motive.

During the years in issue, the Campbell ranch was not used for recreational or social entertaining.  Petitioners did not ride the horses they owned for pleasure.  The "pleasure" Mr. Rinehart derived from his involvement in the horse breeding activity was not the enjoyment associated with recreation; it was the satisfaction associated with a job or occupation. Additionally, many of the duties performed by petitioner were not activities that provided personal pleasure or recreation. Accordingly, this factor does not weigh against petitioners.

Conclusion

We note that Mr. Rinehart previously litigated in this Court whether the horse breeding activity was an activity not engaged in for profit for the years 1992 and 1993.  Rinehart v. Commissioner, T.C. Memo. 1998-205 (Rinehart I).  Each taxable

year, however, stands on its own and must be separately considered. United States v. Skelly Oil Co., 394 U.S. 678, 684 (1969); Pekar v. Commissioner, 113 T.C. 158, 166 (1999).

At the previous trial, Mr. Rinehart appeared pro se, his trial lasted approximately 3 hours, and the only witness for the taxpayer was Mr. Rinehart. In the instant case, Mr. Rinehart was represented by counsel, evidence was presented over 3 full days, and additional witnesses corroborated Mr. Rinehart's testimony regarding the horse breeding activity. In Rinehart I, Mr. Rinehart stipulated that he was not involved with any other activity similar to the horse breeding activity, that he did not possess adequate records of income and losses for the horse breeding activity, that he did not keep adequate records on each of his horses, and that he received personal pleasure and enjoyment from the horse breeding activity. The evidence in this case clearly established that these stipulations do not apply to the years here in issue. Accordingly, we have reached our decision herein in light of the voluminous new evidence presented to the Court.

The evidence established that Mr. Rinehart maintained adequate records, operated the horse breeding activity in a businesslike manner, had extensive expertise about horse breeding, expended a significant amount of time on the horse breeding activity, had a reasonable expectation that the assets

used in the activity would appreciate in value, and had success in other breeding activities.  Furthermore, Mr. Rinehart sustained the losses in issue during the startup phase of the horse breeding activity.  Accordingly, we conclude that Mr. Rinehart engaged in the horse breeding activity during 1994, 1995, and 1996 with the primary purpose and intent of making a profit within the meaning of section 183.

Our holdings in this opinion will be incorporated into the decisions to be entered in these cases when all other issues are resolved.