T.C. Memo. 2002-200


UNITED STATES TAX COURT


TIMOTHY THOMAS AND JANICE KATHLEEN KUBERSKI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1174-01.                    Filed August 12, 2002.


     Timothy Thomas Kuberski and Janice Kathleen Kuberski,
pro sese.

     <u>Charles J. Graves</u>, for respondent.


          MEMORANDUM FINDINGS OF FACT AND OPINION


     COHEN, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes and an addition to tax as
follows:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) |
|------|-----------|----------------------------------|
| 1994 | $25,014 | $5,628.38 |
| 1995 | 31,785 | -- |
| 1996 | 20,543 | -- |
| 1998 | 19,554 | -- |

The issue for decision is whether petitioners are entitled to deduct losses claimed on their Schedule C, Profit or Loss From Business, for Caduceus Thoroughbreds, a horse breeding and racing operation.  Respondent determined that petitioners' horse activity was not an activity engaged in for profit within the meaning of section 183.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

                          FINDINGS OF FACT

     Petitioners were residents of Phoenix, Arizona, at the time they filed their petition.  At all material times, Timothy Thomas Kuberski (petitioner) was a physician.  Petitioners filed joint Federal income tax returns for 1994 through 1998, reporting annual combined earnings from employment ranging from approximately $287,000 to approximately $342,000.

     Petitioner has been involved in the thoroughbred horse industry in Arizona since 1980.  Petitioner's goal was to breed, raise, and race thoroughbred horses.

During the years in issue, petitioner operated Caduceus Thoroughbreds in conjunction with Sun State Farm, an S corporation. Petitioner and Fillipo Santoro (Santoro) formed Sun State Farm in 1986 to develop a modern and complete thoroughbred horse facility capable of dealing with all facets of the thoroughbred industry. In 1986, Sun State Farm purchased a 36-acre parcel of land in Wickenburg, Arizona (the farm). The farm was flat, was zoned for farming, had good access to nearby highways, and had a good water supply. Petitioner, with the help of his uncle and ranch manager, made certain improvements to the farm, including constructing barn facilities for the horses.

Horses that Caduceus Thoroughbreds owned were boarded at the Sun State Farm facility from 1986 through 1996. Caduceus Thoroughbreds deducted boarding fees totaling $416,236 that were paid to Sun State Farm from 1986 through 1996.

Petitioner and Santoro dissolved Sun State Farm after a "falling out" in 1996. Petitioner's horses remained at the property, and petitioner continued to market his thoroughbreds using the name Sun State Farm.

Petitioner wrote a business plan in 1995 for Caduceus Thoroughbreds that was a supplement to a plan written for Sun State Farm in 1987. Although the name on the 1995 business plan had changed, petitioner had not significantly changed the operations.

The business plan that petitioner wrote in 1987 for Sun State Farm identified key advisers to the business, such as a veterinarian, an accountant, a nutritionist, and other experts in the thoroughbred horse industry. The 1987 plan identified farm assets and their potential appreciation and outlined expenses such as wages, utilities, boarding fees, race training fees, and sale preparation fees. The business plan included a cashflow projection, an income and loss statement, a description of additional revenue sources, and a listing of potential capital improvements for the farm. Petitioner projected annual expenses of $93,100 and annual income of $102,600. The plan also projected the acquisition of a stallion to proceed with the breeding operation. The plan included an economic analysis compiled by the University of Arizona, which studied the impact of the thoroughbred horse breeding industry on the Arizona economy.

The 1995 supplement gave a general description of the operations of Caduceus Thoroughbreds but did not include any financial data or income projections other than a projected cost of between $7,000 and $10,000 to prepare a horse for the racetrack. The new plan emphasized a change in focus from breeding to racing. The plan also cautioned that, despite increasing purses, the value of Arizona thoroughbreds had not improved commensurately, and owners were still buying expensive

horses elsewhere.  Petitioner projected that, as his operation became more experienced and recognized, the potential for profit would increase.

Petitioner believed that he could breed a better-than-average thoroughbred horse because of his medical background and his understanding of physiology and statistical analysis. Petitioner is a licensed trainer and owner, as well as a certified horse appraiser.  He has taken annual classes on taxes, business, shoeing horses, veterinary problems, animal husbandry, and sales preparation.  Petitioner wrote several articles for the thoroughbred horse industry, including one explaining the dosage system, a horse breeding theory, and others related to various medical problems in the racehorse industry.  Petitioner sent out bills every month, knew all the mares on the farm, and knew why particular mares were bred with his stallion.

Petitioners characterize the thoroughbred horse industry as a "loss" industry and contend that statistically it is possible to make a profit only once every 25 years.  Petitioners have never made a profit from their Schedule C horse breeding and racing activity.

From 1980 through 1998 (excluding 1981, 1983, and 1985 for which no information was introduced), petitioners reported the following gross receipts and losses with respect to the horse-

related activity on Schedules C of their Federal income tax returns:

| Year | Gross Receipts | (Loss) |
|------|---------------|--------|
| 1980 | -0- | $(1,825) |
| 1982 | -0- | (435) |
| 1984 | $136 | (22,690) |
| 1986 | 5,375 | (44,320) |
| 1987 | 13,832 | (46,440) |
| 1988 | 5,935 | (39,684) |
| 1989 | 3,434 | (38,602) |
| 1990 | 2,306 | (33,662) |
| 1991 | 14,388 | (89,355) |
| 1992 | 33,280 | (106,041) |
| 1993 | 39,662 | (96,738) |
| 1994 | 40,485 | (62,142) |
| 1995 | 19,824 | (80,205) |
| 1996 | 26,630 | (67,605) |
| 1997 | 24,931 | (95,432) |
| 1998 | 52,492 | (63,087) |
| Total | $282,710 | $(888,263) |

Petitioners' returns for 1994, 1995, and 1996 reported, on Schedule E, Supplemental Income and Loss, losses from Sun State Farms.  Their returns for the years in issue reported, on Forms 4797, Sales of Business Property, the following sales of horses:

1994     2 horses @ $1,000

1995     1 horse @ $500
         1 horse @ $1,000
         1 horse @ $1,500
         1 horse @ $2,000

Only two of the horses were sold for more than they cost, for a combined profit of $333.

Petitioners' 1994 return was signed by petitioner on February 18, 1997.

OPINION

Respondent determined that petitioners' horse breeding was not an activity engaged in for profit within the meaning of section 183. Section 183(a) provides that, if an activity is not engaged in for profit, no deductions attributable to the activity shall be allowed except as provided in section 183(b). Section 183(b)(1) allows only those deductions that are not dependent upon a profit motive, such as taxes. Section 183(b)(2) allows the deductions that would be allowable if the activity was engaged in for profit, but only to the extent that gross income attributable to the activity exceeds the deductions permitted by section 183(b)(1). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Petitioners bear the burden of proving that the requisite profit motive exists. Rule 142(a); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Section 7491(a), which is effective with respect to court proceedings arising in connection with examinations by the Commissioner commencing after July 22, 1998, the date of its enactment by section 3001(a) of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, 112 Stat. 726, does not apply to place the burden of

proof on respondent in this case. Petitioners have neither argued that section 7491 is applicable nor established that they complied with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, to maintain required records, and to cooperate fully with respondent's reasonable requests. In addition, as discussed below, they have failed to introduce credible evidence with respect to certain factual issues.

The Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie, has held that, for a deduction to be allowed under section 162 or section 212(1) or (2), a taxpayer must establish that he engaged in the activity with the primary, predominant, or principal purpose and intent of realizing an economic profit independent of tax savings. Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). The taxpayer's expectation need not be a reasonable one, but the profit objective must be bona fide. Golanty v. Commissioner, supra at 426; sec. 1.183-2(a), Income Tax Regs. In determining whether the requisite intention to make a profit exists, greater weight is to be given to the objective facts than to the taxpayer's self-serving characterization of his intent. Indep. Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in determining whether the taxpayer has the requisite profit objective. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.

These factors are not intended to be exclusive, and no one factor or majority of the factors need be considered determinative. Golanty v. Commissioner, supra at 426-427; sec. 1.183-2(b), Income Tax Regs. The most significant factors in this case are the manner in which petitioner carried on his thoroughbred horse breeding and racing activity, the history of income and loss, the absence of occasional--or any--profits, and the financial status of the taxpayer.

Petitioners argue that they conducted their thoroughbred breeding and racing operation in a businesslike manner. Maintaining complete and accurate books and records, conducting

the activity in a manner substantially similar to comparable businesses that are profitable, and making changes in operations to adopt new techniques or abandon unprofitable methods are factors that may indicate that a taxpayer conducted the activity for profit. Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners argue that they kept detailed and well thought out business plans, maintained business account records with yearly profit and loss statements, filed stallion reports and reports of all broodmares and registered all foals with the Jockey Club, used a bookkeeping service, used business stationery and a business checking account, made a yearly assessment of the market, culled nonproductive mares or poorly marketable horses, made an economic forecast of each horse's productivity, and tracked the annual cost of getting each mare and foal to the thoroughbred sales. Petitioners' arguments, however, appear to have been copied from the tax guides for horse owners that they presented at trial and have little support from the evidence. Their briefs do not cite the record, and, in most instances, there is no support in the record for their assertions.

Petitioners offered the 1987 business plan, the 1995 supplement thereto, a 1996 brochure for the Arizona Thoroughbred Breeders Association Yearling Sale, and Federal income tax returns for the years in issue to support and substantiate their

claims.  Petitioner's testimony was generally vague and focused on the nature of the Arizona thoroughbred industry, rather than on the manner in which he conducted the breeding and racing operations.  Petitioner alluded to one instance in which he consulted a nutritionist to eliminate a condition called epiphycytis.  Petitioner's testimony was uncorroborated by witnesses or documents.

The evidence presented at trial does not persuade us that petitioner maintained records for the purpose of "cutting expenses, increasing profits, and evaluating the overall performance of the operation".  Golanty v. Commissioner, supra at 430; see also Sullivan v. Commissioner, T.C. Memo. 1998-367 (generally no profit motive where lack of evidence that taxpayer used records to improve losing venture), affd. without published opinion 202 F.3d 264 (5th Cir. 1999).  Petitioner testified that "all the records in the world, or business plans in the world are not going to make a difference on whether you make a profit in this".  A businesslike operation, however, would include analyses on why large losses recurred over a long period and whether any possibility of recouping them existed.

A taxpayer's history of income or loss with respect to an activity may indicate the presence or absence of a profit objective.  Golanty v. Commissioner, 72 T.C. at 426.  The magnitude of the activity's losses in comparison with its

revenues is an indication that the taxpayer did not have a profit motive. Burger v. Commissioner, 809 F.2d 355, 360 (7th Cir. 1987), affg. T.C. Memo. 1985-523. A continuous series of losses during the startup stage will not necessarily be deemed indicative that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, the cumulative loss should not be of such a magnitude that an overall profit from a combination of operations and realized appreciation of business assets could not possibly be achieved. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(b)(4), Income Tax Regs.

From 1980 when petitioner began the thoroughbred horse activity through 1998, Caduceus Thoroughbreds had cumulative losses exceeding $888,000. The Court has recognized that the startup phase of a horse breeding activity is 5 to 10 years. Engdahl v. Commissioner, 72 T.C. at 669. In this case, the years in issue are well beyond the period customarily necessary to bring a similar operation to profitable status. Sec. 1.183-2(b)(6), Income Tax Regs.

Petitioners' Schedule C losses for 1994, 1995, 1996, and 1998 are $62,142, $80,205, $67,605, and $63,087, respectively. Petitioners claim that the losses were due to unforeseen circumstances such as lawsuits against the business, downturns in business, changes in the purse structure at races, a decrease in

Breeder's awards, and death or problems with important horses. However, petitioners presented no evidence at trial to corroborate their claims. In fact, the 1995 business plan supplement states that purses in races had increased over the years but that the value of Arizona thoroughbreds had not increased commensurately. The evidence available from the record indicates that, despite petitioner's realization that the thoroughbred horse activities had not proved profitable, no substantial changes were made to the operations.

The amount of profits earned in relation to the amount of losses incurred, the amount of the investment, and the value of the assets in use may indicate a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. Profit means economic profit, independent of tax savings. Drobny v. Commissioner, 86 T.C. 1326, 1341 (1986); Engdahl v. Commissioner, 72 T.C. at 670. Petitioners' Federal income tax returns reflect that, without the effect of depreciation deductions, two horses were sold at a profit of $333 during the 4 years in issue. Petitioner has never made a profit in his horse activities, although they have generated generous tax savings in the form of depreciation deductions and net losses that offset his substantial income as a physician.

Petitioners argue that the Internal Revenue Service unfairly pursues high income taxpayers who engage in breeding and racing

horses.  Obviously, petitioners' financial status permits them to engage in an activity reporting large losses over decades.  The financial status of the taxpayers is an appropriate inquiry under the regulations, section 1.183-2(b)(8), Income Tax Regs., and in the case law.  See Golanty v. Commissioner, 72 T.C. at 428.  Petitioners' level of income permitted them to continue the horse activity without a profit.  If they had regarded the activity as a business, they would have focused more on the financial aspects and ways to cut their losses.  Only their other income allowed their continued pursuit of losing operations.

Petitioners argue that many years of losses are necessary to make a profit in the horse breeding and racing industry.  They cite Duley v. Commissioner, T.C. Memo. 1981-246, for the proposition that the opportunity to earn a profit in a highly speculative venture is sufficient to demonstrate profit motive.  Petitioner claims that he bred Quinton's Fan Club, a horse that sold as a yearling for $7,500 and, after the sale, went on to become a world record holder and stakes winner of over $100,000.  No evidence was presented regarding petitioner's reliance on a professional trainer or petitioner's own ability to train and run a racehorse whose winnings would provide him with a realistic chance of recovering the losses incurred in prior years.

Petitioners contend that certain assets that have appreciated in value over the years should be considered when

analyzing whether the requisite profit motive exists.  They claim that the farm where the horses were boarded appreciated over the years.  There is no reliable evidence in the record, however, of the value of the land.  Petitioner gave evasive and inconsistent testimony about disposition of the land when Sun State Farm was dissolved.  Petitioner testified:

> Q  [Respondent's counsel]  When Sun State Farm was dissolved, the property was sold; is that correct?
>
> A  [Petitioner]  Yes.
>
> Q    In 1996, after Sun State Farm was dissolved, who purchased that property?
>
> A    I don't know.
>
> Q    You don't know?
>
> A    No.
>
> Q    Did you purchase that property?
>
> A    No.
>
> Q    So, you just previously testified that you currently own that property; is that correct?
>
> A    Yes.
>
> Q    So at what point did you purchase the property?
>
> A    I never purchased it.

It is unclear from this testimony how petitioner would have had an interest in appreciation of the land after 1996, and there is no evidence that any appreciation was realized in or before 1996.

Petitioners also argue that the stallion Sunny Feet was purchased at no cost but was one of the most successful stallions in Arizona, producing 10-percent stakes winners and over $100,000 in futurity stakes races. Petitioner stated that the stallion's untimely death had compromised his chances of making a profit from breeding fees and awards. No credible evidence was offered by petitioners with regard to Sunny Feet to substantiate their claims.

Petitioner considers himself an expert in the thoroughbred industry and believes that, as a physician with a background in statistical analysis, he can produce a higher quality thoroughbred than other Arizona breeders. A taxpayer's expertise, research, and study of an activity, as well as his consultation with experts, may be indicative of a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs. In the 1995 supplement to the business plan, petitioner stressed that the focus of Caduceus Thoroughbreds would be on nutrition and training. Although petitioner named several key advisers to the breeding and racing operation in the 1987 and 1995 business plans, he did not present any further evidence of their expertise in the industry or that he actually relied on such experts. Petitioner has no formal training in equine science and has not shown that he performed any research or analysis on the profitability of his operations.

Petitioners devote considerable attention in their brief to arguing that the regulations set an impossible mandate for profitability in the horse racing and breeding industry. Specifically, petitioners point to the presumption under section 1.183-1(c), Income Tax Regs., that a horse breeding or racing activity is engaged in for profit if its gross income exceeds deductions for any 2 of 7 consecutive years. Petitioners emphatically argue that it is only possible to make a profit once in 25 years. Although petitioners seem to think otherwise, an activity's history of losses is not an exclusive factor, nor is it an impossible obstacle to overcome in successfully proving a profit motive in horse breeding activities. See Rinehart v. Commissioner, T.C. Memo. 2002-9; Routon v. Commissioner, T.C. Memo. 2002-7; Jordan v. Commissioner, T.C. Memo. 2000-206; Yancy v. Commissioner, T.C. Memo. 1984-431; Ellis v. Commissioner, T.C. Memo. 1984-50; Coe v. Commissioner, T.C. Memo. 1974-129; Deerman v. Commissioner, T.C. Memo. 1974-84; Foster v. Commissioner, T.C. Memo. 1973-13. It is a persuasive factor in this case, however, because of the amount of the losses, the length of the period of losses, and the absence of offsetting considerations. We conclude that petitioner's horse breeding and racing operation was not an activity engaged in for profit.

Section 6651(a)(1) imposes an addition to tax for failure to file a required return on the date prescribed, unless it is shown

that such failure is due to reasonable cause and not willful neglect. Petitioners' 1994 tax return was signed February 18, 1997. Petitioners presented no evidence and did not offer any explanations as to why they failed to file timely their 1994 return. Neither petitioners' trial memorandum nor their opening brief mentioned the late filing of their return. They are thus deemed to have conceded the issue. They belatedly claim in their reply brief that they were not given enough time to address this issue. The trial of this case substantially exceeded the time estimated by the parties. Much time was wasted by petitioner's refusal to execute an appropriate stipulation or to heed the Court's attempts to direct his testimony to relevant facts. Petitioners are liable for the addition to tax for 1994.

We have considered petitioners' remaining arguments. To the extent that they are not discussed above, those arguments are totally lacking in merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent.</u>