T.C. Memo. 2003-109

UNITED STATES TAX COURT

DALE A. RINEHART AND JEANA L. YEAGER, f.k.a. JEANA L. RINEHART,
ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20185-98, 15968-99,     Filed April 18, 2003.
          15969-99,  7007-00.

<u>Frank C. Hider</u>, for petitioners.

<u>Abbey B. Garber</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  This case is before the Court on
petitioners' motion for leave to file out of time a motion for

---

[1] Cases of the following petitioners are consolidated
herewith:  Jeana L. Yeager, docket No. 15968-99; Dale A.
Rinehart, docket No. 15969-99; Jeana L. Yeager, docket No. 7007-
00.

reconsideration of opinion (motion for leave) and petitioners'
motion for reconsideration of opinion and memorandum brief in
support thereof (motion for reconsideration) regarding our
opinion in Rinehart v. Commissioner, T.C. Memo. 2002-71 (Rinehart
II).

Respondent determined deficiencies in and penalties on
petitioners' Federal income taxes as follows:

| Docket No. | Year | Deficiency | Penalty Sec. 6662 |
|---|---|---|---|
| 20185-98 | 1994 | $46,894 | $9,379 |
| 15968-99 | 1995 | 29,264 | 5,853 |
| 15969-99 | 1995 | 28,765 | 5,753 |
| 15969-99 | 1996 | 53,869 | 10,774 |
| 7007-00 | 1996 | 27,032 | 5,406 |

In Rinehart v. Commissioner, T.C. Memo. 2002-9 (Rinehart I), we
addressed the issue of whether Dale A. Rinehart's (Mr. Rinehart)
horse breeding activity was an activity not engaged in for profit
for 1994, 1995, and 1996.  In Rinehart II, we addressed the
issues of whether petitioners had cancellation of indebtedness
income (COD income) for 1995 and whether petitioners were liable
for penalties pursuant to section 6662(a).[2]  In Rinehart I and
Rinehart II, we made no findings and reached no conclusions
regarding petitioners' marital status for Federal income tax
purposes.

---

[2]  Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

In the motion for leave and the motion for reconsideration, petitioners argue that the Court needs to address petitioners' marital status in order to resolve computational adjustments and the section 6662 penalties contained in the notices of deficiencies.[3] Petitioners contend they will be harmed absent a ruling on these issues. Accordingly, even though they seek to file the motion for reconsideration considerably more than 30 days after our written opinion in Rinehart II was served, they argue that in the interest of justice we should permit them leave to file the motion for reconsideration and reconsider our opinion. Respondent does not object to granting petitioners leave to file the motion for reconsideration.

We agree that it is in the interest of justice to permit petitioners to file the motion for reconsideration. Accordingly, we shall grant the motion for leave, and we shall grant the motion for reconsideration in order to address the following issues: (1) The marital status of Mr. Rinehart and petitioner Jeana L. Yeager (Ms. Yeager)[4] for Federal income tax purposes for 1994, 1995 and 1996, and (2) whether petitioners are liable for penalties pursuant to section 6662(a) related to claiming a

---

[3] Petitioners do not seek reconsideration of any of our other findings or conclusions in Rinehart II.

[4] We use the term "Ms. Yeager" for convenience only. The use of this term is not a finding regarding petitioners' marital status during the years in issue.

filing status of single on their 1995 and 1996 tax returns.  Rule 161.

FINDINGS OF FACT

We incorporate our findings in Rinehart I and Rinehart II herein by this reference.

<u>Marriage, Divorce, and Annulment</u>

In 1992, Ms. Yeager married William Z. Williams in the State of Washington.  Sometime thereafter, Mr. Williams filed for divorce.  In August 1994, the Superior Court of Washington issued a Decree of Dissolution dissolving Ms. Yeager and Mr. Williams' marriage (Decree of Dissolution).  The court decreed that Ms. Yeager's name was changed to "Jeana Lee Yeager".  Ms. Yeager did not contest the divorce.

In October 1994, petitioners married in Texas.  Ms. Yeager received a copy of the Decree of Dissolution before she married Mr. Rinehart.

Shortly after his marriage to Ms. Yeager, Mr. Rinehart filed a Life Event Change Form with his employer, American Airlines, to notify it of his marriage to Ms. Yeager.  Mr. Rinehart filed this form so that Ms. Yeager would be afforded spousal benefits from American Airlines.  In November 1994, Mr. Rinehart filed forms with American Airlines designating Ms. Yeager the beneficiary of his retirement benefits program.

In or about November 1994, Ms. Yeager filed a Complaint for Declaratory Judgment against Mr. Williams in the State of Washington. As a result of the divorce, Ms. Yeager wanted to be released from a management contract between Mr. Williams and herself. In this complaint, Ms. Yeager acknowledged that she was divorced from Mr. Williams and referred to Mr. Williams as her ex-husband.

In January 1995, Richard G. Rutan and the trustee for Voyager Aircraft Inc. (Voyager) filed a Complaint for Money Damages listing Ms. Yeager as a defendant (Rutan lawsuit).[5]

On January 12, 1996, in the District Court, 336th Judicial District, Grayson County, Texas (the Texas State court), Mr. Rinehart sought an uncontested annulment from Ms. Yeager pursuant to section 2.22[6] of the Texas Family Code. Mr. Rinehart claimed that Ms. Yeager's marriage to Mr. Williams was never dissolved by divorce, annulment, or death.

On the same day, Ms. Yeager filed a Waiver of Service, Appearance, and Admission of Facts (the Waiver). In the Waiver,

---

[5] The Rutan lawsuit arose from Ms. Yeager's involvement with Mr. Rutan and Voyager in an attempt to fly an airplane around the world without stopping or refueling. In December 1986, Mr. Rutan and Ms. Yeager accomplished this feat, an aviation milestone, and as a result the airplane used to accomplish it hangs in the Smithsonian Air and Space Museum. In the Rutan lawsuit, Mr. Rutan alleged that Ms. Yeager misappropriated memorabilia and funds from Voyager.

[6] In 1997, sec. 2.22 of the Texas Family Code was renumbered sec. 6.202. Tex. Fam. Code sec. 6.202 (Vernon 1998).

Ms. Yeager indicated that she did not contest the annulment.  In the Waiver, Ms. Yeager swore that when she married Mr. Rinehart the divorce action between her and Mr. Williams was not final and was still pending before the court in Washington State.

Also that same day, the Texas State court issued a Decree of Annulment declaring petitioners' marriage null and void.  At Ms. Yeager's request, the Texas State court ordered and decreed that Ms. Yeager's legal name was Jeana Lee Williams.

The reason petitioners obtained the annulment was to insulate Mr. Rinehart's assets from Ms. Yeager's creditors.  Even though the Texas State court annulled petitioners' marriage, Ms. Yeager considered herself divorced from Mr. Williams because Mr. Williams had not taken any legal action to set aside the divorce.

In February 1996, 1 month after the Decree of Annulment was issued, Ms. Yeager filed for bankruptcy.  In the bankruptcy petition, Ms. Yeager stated that she was divorced and that Mr. Williams was her ex-husband.  On the bankruptcy petition, Ms. Yeager listed her last name as "Yeager", and not "Williams".  Ms. Yeager filed the bankruptcy petition 2 days before the final settlement conference, and approximately 1 week before the trial, in the Rutan lawsuit.

Sometime after the filing of the bankruptcy petition, the Rutan lawsuit was settled.  Mr. Rutan dropped the Rutan lawsuit after learning that Ms. Yeager had filed for bankruptcy, was divorced, and was earning only $400 a month as a ranch hand.

In October 1996 and October 1997, Mr. Rinehart signed health insurance benefit forms that listed Ms. Yeager as his wife.[7] Sometime after March 26, 1997, Mr. Rinehart mailed a letter to American Airlines discussing the surgical health benefits for his wife, Ms. Yeager.

Around April 1997, Mr. Williams died.

In June 1999, Mr. Rinehart initialed a Pension Benefit Election Form that listed Ms. Yeager as his wife.

In February 2000, respondent served a set of interrogatories on Ms. Yeager. In March 2000, Ms. Yeager responded to these interrogatories. In her responses, Ms. Yeager admitted that (1) she had received documents from the court in Washington State that the divorce from Mr. Williams was final and (2) she was finally divorced from Mr. Williams in August 1994.

From the date of their marriage through the time of trial, petitioners lived together. During this time, petitioners held themselves out as husband and wife. During and subsequent to the years in issue, people referred to Mr. Rinehart as "Mr. Yeager" and to Ms. Yeager as "Mrs. Rinehart".

---

[7] Ms. Yeager was eligible for spousal benefits, including health insurance coverage, from American Airlines only if she and Mr. Rinehart were married.

Tax Returns

Petitioners timely filed their tax returns for 1994, 1995, and 1996. Petitioners filed a joint return for 1994 and filed separate returns claiming a filing status of single for 1995 and 1996. Ms. Yeager listed her last name as "Yeager", and not "Williams", on her 1995 and 1996 returns.

Petitioners filed a joint Federal income tax return for 1999. On this return, Ms. Yeager listed her last name as "Rinehart".

In January 2001, 1 month prior to the trial in this case, Mr. Rinehart filed a Form 1040X, Amended U.S. Individual Income Tax Return, for 1999 changing his filing status from Married filing joint return to Single. Ms. Yeager also filed an amended return for 1999 claiming single status. On the amended return, Ms. Yeager listed her last name as "Yeager".

OPINION

I.  Marital Status

    A.  Burden of Proof

As a preliminary matter, petitioners argued that respondent raised a new issue in the answer by asserting that petitioners should be treated as married for their Federal income tax filing status, and consequently respondent bears the burden of proof on the issue of whether petitioners should be treated as married during the years in issue.

Generally, petitioners bear the burden of proof.[8]  Rule 142(a).  Respondent, however, bears the burden of proof with respect to any new matter pleaded in the answer.  Id.  An assertion in the answer is treated as a new matter when it either increases the original deficiency or requires the presentation of different evidence.  Shea v. Commissioner, 112 T.C. 183, 197 (1999); Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989).  A new theory that merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof.  Shea v. Commissioner, supra at 191; Wayne Bolt & Nut Co. v. Commissioner, supra at 507.

In notices of deficiency for 1994, 1995, and 1996 issued to petitioners, respondent determined that petitioners were married and that petitioners' correct filing status for 1995 and 1996 was married filing separate.  The explanation of adjustments contained in petitioners' notices of deficiency states "Since you were married and domiciled in a community property state, we have computed your tax liability in accordance with community property laws."

In their separate petitions, petitioners claimed that they were not married during the years in issue because the Texas State court had annulled their marriage.  In reply to

---

[8]  Sec. 7491(a) is not applicable to this case.  Rinehart v. Commissioner, T.C. Memo. 2002-9.

petitioners' allegation, respondent responded in his answers that petitioners should be treated as married during the years in issue for purposes of their Federal income tax filing status even though their marriage was annulled in 1996.

Respondent's clarification of the basis of his determination that petitioners should be treated as married did not increase the original deficiency or require the presentation of different evidence.[9]  Accordingly, we conclude that petitioners bear the burden of proof on this issue.[10]

B.    Effect of the Annulment

Petitioners were married in October 1994.  In January 1996, Mr. Rinehart sought an annulment of petitioners' marriage, and the Texas State court issued a Decree of Annulment declaring petitioners' marriage null and void.  On their 1995 and 1996 Federal income tax returns, petitioners designated their filing status as "single".  Petitioners argue that the effect of the Decree of Annulment was to render the marriage void from its inception and that their filing status of "single" for 1995 and 1996 was correct, and they were also entitled to claim a filing status of "single" for 1994.

---

[9]  The evidence regarding the annulment of petitioners' marriage was directly related to respondent's determination that petitioners were married and that Texas community property laws applied.

[10]  We note, however, that our resolution of this issue does not depend on which party bears the burden of proof.

The determination of whether an individual is married shall be made as of the close of the taxable year. Sec. 7703(a)(1). Marital status for Federal tax purposes is defined by State law. Lee v. Commissioner, 64 T.C. 552, 556-559 (1975), affd. 550 F.2d 1201 (9th Cir. 1977).

In general, we give full faith and credit to a determination of marital status by a State court possessed of jurisdiction over the subject matter and parties. E.g., Stark v. Commissioner, T.C. Memo. 2003-47. We are, however, only bound to follow interpretations of State law as announced by the highest court of that State. Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967). Accordingly, we conclude that in the unusual circumstances of this case we are not bound by the decision of the Texas State court regarding petitioners' marital status. Id.; Graham v. Commissioner, 79 T.C. 415, 419-421 (1982). Indeed, petitioners' actions perpetrated a fraud on the Texas State court, and we believe that the Texas Supreme Court would not enforce such a decree against third parties (such as respondent in this case).

Ms. Yeager's marriage to Mr. Williams was dissolved in 1994. As of the close of 1994, 1995, and 1996, and through the time of trial, petitioners lived together as husband and wife and represented themselves to others as being married. Petitioners never intended to and never did physically separate from each

other before or after the annulment. Petitioners supplied information to the Texas State court that conflicted with information Ms. Yeager provided to the Bankruptcy court, Mr. Rinehart provided to his employer, and Ms. Yeager provided to a Washington State court in her Complaint for Declaratory Judgment.

Petitioners' annulment was grounded on their collusive falsehoods. Mr. Rinehart was wrong when, in seeking an annulment from the Texas State court, he stated that Ms. Yeager's marriage to Mr. Williams had not been dissolved by divorce. Likewise, Ms. Yeager was wrong when, in acceding to the annulment, she represented to the Texas State court that her divorce action with Mr. Williams was not final and was still pending in Washington State. These were not honest mistakes.

Based on the foregoing,[11] we sustain respondent's

---

[11] We note that there is an additional reason for disregarding the annulment for tax purposes. In general, an annulment has the effect of declaring a marriage void ab initio under Texas law. Home of the Holy Infancy v. Kaska, 397 S.W.2d 208, 212 (Tex. 1966). It thus "relates back" to erase the marriage from the outset. Id. The doctrine of relation back, however, is not absolute in Texas. Harris v. R.R. Ret. Bd., 3 F.3d 131, 134 (5th Cir. 1993). Courts have recognized that annulment is a legal fiction and the relation back doctrine is a limited concept. Id.; Home of the Holy Infancy v. Kaska, supra at 212. "(I)n cases involving the rights of third parties, courts have been especially wary lest the logical appeal of the fiction should obscure fundamental problems and lead to unjust or ill-advised results respecting a third party's rights." Home of the Holy Infancy v. Kaska, supra at 212 (quoting Sefton v. Sefton, 291 P.2d 439, 441 (Cal. 1955)).

In the present case, Mr. Rinehart filed his petition for an
(continued...)

determination regarding petitioners' filing status for the years in issue.[12]

## II.  Section 6662 Penalties

Pursuant to section 6662(a), a taxpayer may be liable for a penalty of 20 percent on the portion of an underpayment of tax due to negligence or disregard of rules or regulations.[13]  Sec. 6662(b).  Section 6664(c)(1) provides that no accuracy-related penalty shall be imposed with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.  The decision as to whether the taxpayer acted with reasonable cause and in good faith depends upon all

---

[11](...continued)
annulment only 1 month before Ms. Yeager filed her bankruptcy petition.  Up until that time, and since that time, petitioners held themselves out as being married.  Furthermore, as we previously stated, in order to obtain the annulment petitioners supplied incorrect information to the Texas State court.  Their attempt to claim that they were not married as a result of the Decree of Annulment does not promote the purposes for which the relation back doctrine was intended.

[12]  Petitioners also argue that respondent ignores his own rulings, i.e., Rev. Rul. 76-255, 1976-2 C.B. 40, regarding the effect of their annulment.  We disagree.  Petitioners' situation is factually similar to situation 2 in the revenue ruling-- applying the sham transaction doctrine to taxpayers who divorced because it would be advantageous for them to be unmarried at the end of the calendar year, but who never intended to remain unmarried and did not remain unmarried.  See Boyter v. Commissioner, 668 F.2d 1382, 1387 (4th Cir. 1981).

[13]  Sec. 7491(c) is not applicable to these cases.  See supra note 8.

the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

With regard to claiming a filing status of single on their tax returns for 1995 and 1996, we do not believe that petitioners acted with reasonable cause and in good faith. See <u>supra</u> pp. 11-12. Accordingly, we hold that petitioners are liable for the accuracy-related penalties related to their claiming a filing status of single on their tax returns for 1995 and 1996.

To reflect the foregoing,

<u>An appropriate order will</u>

<u>be issued.</u>