T.C. Memo. 2015-54

UNITED STATES TAX COURT

HENRY J. METZ AND CHRISTIE M. METZ, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10346-10, 28718-10,          Filed March 23, 2015.
            5991-11.

<u>Bertram P. Husband</u>, for petitioners.

<u>Mayah Solh-Cade</u>, <u>Jordan Scott Musen</u>, <u>Steven Mitchell Roth</u>, and <u>Michael

W. Berwind</u>, for respondent.

MEMORANDUM OPINION AND FINDINGS OF FACT

HOLMES, <u>Judge</u>:  For over two decades, Henry and Christie Metz have

owned an Arabian horse farm known as Silver Maple Farm (SMF).  Between 2004

and 2009--the years at issue--their farm lost millions of dollars.  The

Commissioner determined that any business that lost this much money couldn't

**[*2]** possibly be motivated by a desire to turn a profit and disallowed the losses. The Metzes disagree.

The question is: Whom do we believe?

OPINION

There are three issues in these cases:

- whether the Metzes operated SMF intending to make a profit;

- whether interest the Metzes paid to their brokerage firm qualifies as investment interest; and

- whether the Metzes' failure to report income from the sale of farm property in 2004 should be subject to an accuracy-related penalty.

While the parties dispute the facts underlying these issues, they don't dispute the governing law. So we begin with a brief review of that law.

I.      Requisite Profit Motive

Taxpayers can deduct all ordinary and necessary expenses paid or incurred in carrying on a trade or business, sec. 162, for the production or collection of income, sec. 212(1), or for the management, conservation, or maintenance of property held for the production of income, sec. 212(2). But before engaging in the "ordinary and necessary" inquiry, taxpayers must pass the section 183 test.[1]

_____

[1] Because we decide this issue on a preponderance of the evidence, we need not decide whether the burden of proof shifts to the Commissioner under section

(continued...)

**[*3]** Section 183(a) generally disallows any deduction attributable to an activity "not engaged in for profit," and is aimed at disallowing the deduction of the expenses of a hobby that a taxpayer might try to use to offset taxable income from other sources. Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." An activity doesn't need to show a profit, but taxpayers must have an actual and honest objective of making one. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983). And this expectation need not even be reasonable. See sec. 1.183-2(a), Income Tax Regs.

How do we determine this? We look at all the facts and circumstances with respect to the activity. Id. para. (b). We focus on the taxpayer's subjective intent, but we don't simply take the taxpayer at his word. We look instead to the objective factors that are listed in the regulations. Wolf v. Commissioner, 4 F.3d

[1](...continued)
7491. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008). (Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue and all Rule references are to the Tax Court Rules of Practice and Procedure.)

**[\*4]** 709 (9th Cir. 1993), aff'g T.C. Memo. 1991-212.[2]  Section 1.183-2(b),

Income Tax Regs., lists the nine factors to consider:

- manner in which the taxpayers carry on the activity;

- expertise of the taxpayers or that of their advisers;

- time and effort expended on the activity;

- expectation that assets used in the activity may appreciate in value;

- success of the taxpayers in carrying on other similar or dissimilar activities;

- history of income or losses with respect to the activity;

- amount of occasional profits, if any, from the activity;

- financial status of the taxpayers; and

- any elements of personal pleasure or recreation.

This list isn't exclusive, and we don't just tally up the factors for and against

taxpayers to determine if they win.  Sec. 1.183-2(b), Income Tax Regs.  While we

consider all the facts and circumstances, we may give more weight to some than to

others.  See Dunn v. Commissioner, 70 T.C. 715, 720 (1978), aff'd, 615 F.2d 578

(2d Cir.1980); sec. 1.183-2(b), Income Tax Regs.

---

[2] Because these cases are appealable to the Ninth Circuit, we follow that court's precedent.  See, e.g., Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

**[\*5]** Horse-farm cases come in herds and not in single stallions, and are among the most frequently litigated under section 183. Each case turns on its facts, see, e.g., Pederson v. Commissioner, T.C. Memo. 2013-54, at \*59 (comparing a small sample of five horse-breeding cases with different outcomes), which can vary widely. They range from the wealthy businessman who runs a real business but keeps a gentleman's farm as a weekend retreat whose expenses he tries to subsidize through deductions to sophisticated, well-run operations that just haven't been able to consistently make a profit. See Helmick v. Commissioner, T.C. Memo. 2009-220, 2009 WL 3012725, at \*7

These cases blaze a helpful trail to the facts that we should look at in any individual case, but they are not precedents from which one can derive ever more precise statements of law. We must not lose sight of the Ninth Circuit's lodestar: "The proper focus of the test to be applied \* \* \* is the taxpayer's subjective intent." Wolf, 4 F.3d at 713 (quoting Skeen v. Commissioner, 864 F.2d 93, 94 (9th Cir. 1989), aff'g 88 T.C. 1086 (1987)).

II.     Investment Interest

The parties also dispute the treatment of certain interest expenses that the Metzes paid over the years. Section 163(a) details the treatment of interest expenses, and states as a general rule that taxpayers may deduct "all interest paid

**[*6]** or accrued within the taxable year on indebtedness." There is an exception, however, for personal interest paid or accrued during a tax year. Sec. 163(h)(1). But as so often in tax law, there is an exception to the exception--the Code excludes from this exception investment interest, interest allocable to a trade or business, interest allocable to passive activities (as under section 469), any "qualified residence interest," as well as a few other categories. Sec. 163(h)(2).

The Metzes claim that the interest they paid is deductible as investment interest, which the Code makes deductible to the extent of a taxpayer's net investment income. Id. subsec. (d). In effect then, where a taxpayer has no net investment income in a given year, he is unable to make use of the investment-interest deduction. The Code, however, allows him to carry any unused deductions forward to later years. Id. para. (2); see Flood v. United States, 33 F.3d 1174, 1178 (9th Cir. 1994). The definition of "investment income" can be a bit fuzzy around the edges: A taxpayer may elect to include in net investment income "certain net capital gain attributable to dispositions of property held for investment," but to do so must timely file a Form 4952, Investment Interest Expense Deduction. Sec. 163(d)(4)(B)(iii); sec. 1.163(d)-1(a) and (b), Income Tax Regs. For purposes of section 163, "property held for investment" includes property which produces income such as interest, dividends, annuities, and

**[*7]** royalties, and is not derived in the ordinary course of a trade or business.  Sec. 163(d)(5)(A); see sec. 469(e)(1).

Money is fungible.  See Berry Petroleum Co. v. Commissioner, 104 T.C. 584, 643 n.37 (1995), aff'd without published opinion, 142 F.3d 442 (9th Cir. 1998).  And that can mean that the connection between interest paid and investment income is difficult to see, especially when a person is also paying interest for money used in his business or for purely personal reasons.  Tax law solves--or at least addresses--this problem by telling taxpayers to trace interest expenses through allocation.  Temporary regulations stipulate the method of allocating interest expenses as applied to section 163(d) (limitation on investment interest) and 163(h) (disallowance of deduction for personal interest).  See generally sec. 1.163-8T, Temporary Income Tax Regs.  "In general, interest expense on a debt is allocated in the same manner as the debt to which such interest expense relates is allocated.  Debt is allocated by tracing disbursements of the debt proceeds to specific expenditures."  Id. para. (a)(3).  Where interest is allocated to an investment expenditure, that expense is investment interest.  Sec. 1.163-8T(a)(4)(i)(C), Temporary Income Tax Regs.  To summarize:  To the extent borrowings can be traced to investment in stocks, securities and the like, associated interest is deductible.

**[\*8]** Allocation rules also apply to interest paid on loans to a trade or business or for any "qualified residence." Sec. 163(h)(2)(A), (D). If a taxpayer engages in a trade or business and borrows money to fund the business, then any interest expense allocated to the business is excluded from the personal-interest exclusion and properly deductible; so too for interest allocable to a qualified residence, where "qualified residence interest" means "any interest which is paid or accrued * * * [on] acquisition indebtedness with respect to any qualified residence of the taxpayer * * *." Sec. 163(h)(3)(A)(i). For this purpose, a "qualified residence" includes a taxpayer's principal residence. Sec. 163(h)(4)(A)(i). There is generally a $1 million limitation on acquisition indebtedness that qualifies for the "qualified residence interest" deduction. Sec. 163(h)(3)(B)(ii).

III.   Accuracy-Related Penalty

The last issue we have to decide is whether the Metzes' failure to report the sale of farm property in 2004 should result in an accuracy-related penalty under section 6662 for underpayment of tax attributable to "negligence or disregard of rules and regulations" or to a "substantial understatement of income tax." The Commissioner, under section 7491, has the burden of production for this penalty, which means the Commissioner has to produce "sufficient evidence indicating that it is appropriate to impose the relevant penalty." Higbee v. Commissioner, 116

[*9] T.C. 438, 446 (2001). Should the Commissioner provide sufficient evidence, it then falls to the taxpayer to provide evidence sufficient to persuade us that the Commissioner is wrong. See id. at 447.

Negligence includes "any failure to make a reasonable attempt to comply with [the Internal Revenue Code]," and "disregard" includes "any careless, reckless, or intentional disregard." Sec. 6662(c). A "substantial understatement of income tax" is any understatement that exceeds the greater of 10% of the tax "required to be shown on the return for the taxable year" or $5,000. Sec. 6662(d).

One important exception applies to the section 6662 penalty. Section 6664(c) creates a "reasonable cause exception." In order to qualify for the exception a taxpayer must show that there was "a reasonable cause for such [underpayment]" and that the taxpayer acted in good faith. Sec. 6664(c)(1). Qualifying for the exception is not always straightforward; it's made "on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs. The regulations provide circumstances that may indicate reasonable cause and good faith, including "an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id.

**[\*10]** One common way for a taxpayer to show that he had reasonable cause and acted in good faith is proof that he relied on a professional adviser. The reasonableness of such reliance is, yet again, determined by looking at all the facts and circumstances, and the taxpayer cannot make any unreasonable assumptions. Sec. 1.6664-4(c), Income Tax Regs.

FINDINGS OF FACT

I.    Background

    A.    Arabian Horses

There is an "antiquity and mystery" that surrounds an Arabian horse. Often recognized for its beauty--a taxpayer in a previous case referred to them as the "ballerinas of the horse world," Keating v. Commissioner, T.C. Memo. 2007-309, 2007 WL 2962774, at \*1, aff'd, 544 F.3d 900 (8th Cir. 2008)--the Arabian is the most versatile breed of horse. Not only do Arabians dominate endurance riding competitions--they're known as the "marathoners"--but they also can be effectively used in cattle ranching.[3]

---

[3] Arabians are also used in a somewhat obscure sporting event known as team penning. Team penning, as explained by one of the Metzes' experts, is "where you get a group of little baby cows, and you have two people on different horses, and they have to take one of the baby cows out of the group, and they have to work it and get it separated from its herd."

**[*11]**    1.    <u>History</u>

Arabian horses were first bred by the Bedouin; strict rules about breeding only horses with verifiable backgrounds gradually distinguished Arabians from other breeds of horse.  In the 17th and 18th centuries, the Ottoman Empire helped spread Arabian horses to the rest of the world.  In the early 1800s, Mohamed Ali, an Ottoman viceroy in Egypt, began collecting horses from the Bedouin, and his collection grew to more than a thousand Arabian horses.

Arabian horses arrived in the United States by the late nineteenth century, and the breed's fame grew after Sultan Abdul Hamid II exhibited them at Chicago's Columbian Exposition of 1893.

2.    <u>The Arabian Horse Market in the United States</u>

Fifteen years later, the organization that became known as the Arabian Horse Registry of America (AHRA) was established.  Its primary function was to register purebred Arabian horses in the United States.  The AHRA had only 71 horses at its start, but over the next few decades the popularity of Arabians grew.  In the 1970s and '80s, however, their popularity exploded, and the registry reached 100,000 in 1973; it reached 200,000 only seven years later, and galloped to 300,000 by 1984.  Part of the breed's popularity was surely due to tax law.  In those days before the passive-activity rules of section 469, horses (like cattle and

[*12] sheep) were stabled in partnerships that used rapid depreciation and nonrecourse financing to generate large deductions. Prices skyrocketed, and the Arabian horse industry became a bubble. During that time, many Arabian horse farms popped up, and--as with puppy mills--many entrepreneurs bred Arabians exclusively for commercial benefit without regard to whether the quality of animals produced was good for the long-term health of the breed. New registrations of Arabian horses in the U.S. peaked in 1985 at 29,999.

Then the bubble burst. The Tax Reform Act of 1986 closed the tax-sheltering "passive investment" loophole, and this limited the use of horse farms as tax shelters. The Arabian horse market, like the markets for many other breeds, collapsed. While the market for some breeds recovered, the one for Arabians did not. In 1995, new registrations reached only about 12,000.

### 3. Registries in Flux

One reason for this failure was the Arabian horse industry's uniquely splayfooted response to the shrinking market: The AHRA's dispute with the World Arabian Horse Organization. Founded in 1972, WAHO had been organized to "maintain throughout the world the purity of the blood of the horses of the Arabian breed." A UK-based nonprofit corporation made up of national associations that are recognized as registering authorities in their respective

[*13] countries, WAHO facilitated the import and export of Arabian horses among owners and breeders throughout the world. Up until the mid-1990s AHRA was the official WAHO member registry for the United States and Mexico.

In 1996, however, WAHO threatened to suspend AHRA's membership unless it agreed to register horses accepted by the WAHO member registries in Argentina and Brazil. The AHRA board of directors balked at this request because they suspected that many of the horses from those two countries had ancestors that were not purebred Arabian horses. WAHO rules, however, required that each member registry accept horses registered by other member registries and prohibit the registration of horses from non-WAHO-approved sources.

Both sides dug in their hooves. And the impasse led to WAHO's suspending and eventually expelling AHRA in 1997. WAHO rules then prevented its member registries from registering AHRA-registered horses. Shrinking a world market to a U.S.-only market was very bad for the U.S. industry, which had a net trade surplus. Foreign buyers (who make up a large segment of the Arabian market) largely disappeared, and the price for top quality U.S. Arabians continued to decline.

After expelling AHRA, WAHO recognized as the United States member registry a new organization formed in Colorado and named the Purebred Arabian

[*14] Horse Registry of America. PAHR reopened international sales of U.S.-bred Arabians, but its registry was extremely small. Between 1999 and 2007--when PAHR was the official WAHO registry in the United States--international sales from U.S. Arabian horse breeders suffered as a result.

The AHRA continued to operate, and in 2000 it merged with the International Arabian Horse Association (IAHA). The IAHA was founded in 1950 and focused on promoting the use of Arabian horses in the United States and Canada and regulating horse shows there.[4] Before the merger the IAHA had begun to experience financial problems of its own.[5] Despite its expulsion from WAHO three years earlier, the AHRA was the more professional and financially stable organization. The merger of the two resulted in a successor organization known as the Arabian Horse Association (AHA). And in 2008 WAHO reinstated the AHA as its official U.S. registry.

---

[4] Although these two organizations were completely independent of each other, the IAHA required purebred Arabian horses to register with the AHRA before competing in IAHA events.

[5] According to one of the Metzes' experts, the cause was a controversial IAHA Judges and Stewards Commissioner. The commissioner had been hired to enforce rules of ethical conduct and establish a higher level of integrity in Arabian horse judging. His alleged favoritism led to experienced litigation that depleted the IAHA treasury. The commissioner ended up resigning, but left behind a bitterly divided Arabian horse community and a financially crippled IAHA.

**[*15]** However, even with a better managed organization running the U.S. registry, the damage had been done. In 2005 new registrations of Arabian horses fell all the way to 8,000.

    4.    <u>New Ways of Breeding</u>

Throughout this long period of organizational infighting, the AHA and its predecessors embraced new breeding technologies. Before the late 1970s (and like registered thoroughbreds to this day), Arabian stallions and Arabian mares engaged in traditional breeding. But not all live covers produced foals, and it was a rare stallion who could mount more than two mares per day. <u>Cf., e.g.</u>, roosters.[6]

Arabian horse breeding, however, changed in 1977 when the AHRA approved artificial insemination. With artificial insemination, a single collection of fresh stallion semen could inseminate as many as ten mares in a day. This could result in a single stallion's impregnating more than 200 mares in a breeding season.

---

[6] "Mrs. Coolidge was in the lead and saw a rooster [busy with] a hen. 'How many times a day does he do that?' she asked. 'Dozens of times,' the farmer replied." For the rest of this story, see Paul R. Ehrlich, Human Natures: Genes, Cultures, and the Human Prospect 190 (2000), <u>available at</u> https://books.google.com/books?id=mHFsScY8ewMC&pg=PA190&dq=coolidge+effect&hl=en&sa=X&ei=xLihVKGwD4a0ggSLx4KABQ&ved=0CC0Q6AEwBg#v=onepage&q=coolidge%20effect&f=false.

**[*16]** In 1995, the AHRA approved the use of transported cooled stallion semen. The old local breeding market of mare owners within 200-300 miles of a stallion became nationwide. Then the AHRA approved the use of frozen semen. While cooled semen typically can be used for only approximately 48 hours after leaving a stallion's body (which generally limits its use to North America), the ability to transport frozen semen allowed American breeders to sell to a worldwide market. The predictable result was an astonishing dispersion of the value of breeding stallions. Top stallions took an increasing share of the breeding market--and, with the approval of frozen semen for use in artificial-insemination programs, could continue to compete in that market even posthumously. But for stallions who did not win the genetic lottery, there was left mostly gelding, giveaways, and gourmet dog food. The only slightly less predictable result--which also affected SMF as we describe below--was an increase in genetic problems as the Arabian gene pool shrank.

These changes in the conditions of production affected all the submarkets of Arabians. But their effects were perhaps most pronounced for the type of Arabian called the Straight Egyptian. The Middle East--and especially the Gulf States--had become the primary market for high-end Arabian horses. Indeed, many of the

**[\*17]** Middle East breeding programs are owned by the ruling families, who take great pride in breeding and preserving what they see as part of their national heritage.

Within the Arabian breed, the Straight Egyptian is, according to the undisputed testimony of the Metzes' experts, respected as a source of elite genetics and unsurpassed beauty. It's also the only subpopulation of horses within the Arabian breed that's been maintained as genetically distinct. Straight Egyptians enjoy greater demand in a global market whose high end is set by customers in the Middle East. Their popularity shows up in the numbers: While Straight Egyptians were only about 3% of all U.S. registrations for Arabian horses in 1985, they were over 10% in 2005. Thus, the Straight Egyptians have significantly increased their share of Arabian registrations even as new registrations of Arabian horses have significantly decreased over the past few decades.

The Metzes have been involved in the Arabian market throughout all this turmoil. And their farm specializes in Straight Egyptians. But before riding further into their battle with the Commissioner, we canter a bit into their background.

[*18] B.     The Metzes

Henry Metz grew up in the baking business.  His grandfather had founded Metz Baking Company in Omaha, Nebraska in 1922, and Henry's father succeeded him.  Henry went off to Lincoln to the University of Nebraska to study business administration, but he didn't finish, and instead, already married to Christie with a one-year-old, headed with his family to Sioux City in 1973 to begin working in sales for the family business.  Although the bakery then employed 1,500 people, it was in the middle of a rough stretch; Henry estimated that between 1966 and 1978, the company lost $500,000 to $1,000,000 per year.  By 1983 Henry was president and chief operating officer (his older brother became vice chairman and his father remained chairman of the board) and played a key role in turning the business around.  By 1988 the bakery was making $1 to $3 million per year and was building a new facility.

The company flourished.  Around 1989, RT Holdings, a Belgian sugar business, took a 70% equity stake while Henry and his brother held on to the other 30%.  Henry happily managed the new operation as CEO for the next five years or so.  In 1994, however, Specialty Foods purchased the company in a leveraged buyout.  The resulting asset sales to pay down acquisition debt led Henry to step down as CEO and president.  His last role at the firm was to "stay in place, not to

[*19] be disruptive, to hire a successor and train him" for the baking business. In 2000 a company known as Earthgrains bought the business for around $650 million, which according to Henry was his "swan song."

Henry had received $10 to $12 million in 1989 when the Belgians took on a majority interest in Metz Baking and another $10 to $12 million in 1994 as part of the LBO with Specialty Foods.

All of those proceeds went into an investment account with JP Morgan. Henry leveraged that money by about 50% with a loan from JP Morgan to trade and invest. And Henry's use of margins from 1994 up to 2007 was generally successful. Between 2004 and 2007--the first four years at issue here--the JP Morgan investment account earned hundreds of thousands of dollars:

| Item | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| Interest | $142,897 | $150,576 | $151,292 | $87,562 |
| Dividends | 429,891 | 238,519 | 251,603 | 271,747 |
| Capital gains | 398,564 | 690,465 | 584,597 | 923,272 |
| Total | 971,352 | 1,079,560 | 987,492 | 1,282,581 |

Through 2007 the Metzes used this account as the primary source of the cash needed for their horse-breeding activity.

But then came 2008. Although the Metzes relied heavily on Morgan to manage the account, Henry called his Morgan broker that January to suggest

[*20] getting out of the margin activity and moving into cash. The Morgan broker recommended that they ride it out, and Henry acquiesced. The decision ended in disaster. The stock market collapse later that fall completely wiped out the Metzes; a margin call forced them to sell their entire stock portfolio in 2008. And that sell-off triggered a considerable capital gain.

| Item | 2008 |
|---|---:|
| Interest | $47,571 |
| Dividends | 162,127 |
| Capital Gains | 5,271,088 |
| Total | 5,480,786 |

The Metzes' primary funding source for their horse-breeding activity had vanished.

C.    Silver Maple Farm

This horse-breeding activity had a name--Silver Maple Farm, Inc. Although the Metzes bought their first Arabian in 1989, they claim to have made Arabian horses into a business only in 1991. This was five years after the 1986 Code, and they had observed that over those five years, the prices of a quality Arabian had dropped from approximately $300,000-$500,000 to $30,000-$50,000. Henry credibly testified that they thought prices had reached their bottom. And that year,

[*21] the Metzes formed SMF in Iowa as an S corporation. Christie was the sole shareholder, president, and secretary. Drawing on her fine-arts education and two decades of work as an interior designer, she worked 50-60 hours a week on farm advertising, marketing, and promotions. Henry also worked full-time at the farm during the years at issue and served as SMF's vice president and treasurer.

The Metzes first ran SMF out of Sioux City. However, after a string of annual losses, they decided in 1995 to move the operation to Naples, Florida and bought a farm there for $550,000. They viewed Naples as an ideal destination-- their new farm was situated in a strong horse and agricultural state. Although they knew that an Arabian horse industry existed in Florida, there was nothing comparable to the scale of SMF's operations. But the move didn't work: SMF's costs kept increasing and, because Naples wasn't an Arabian horse stronghold, they weren't getting the necessary traffic to capture potential buyers. The losses continued to mount.

The Metzes decided again to move SMF's operations; this time, across the country. In early 2003, they took 32 horses from Naples out west to the Santa Ynez Valley in California. The Santa Ynez Valley has the largest concentration of Arabian horse farms in the United States, which means there are equine veterinarians and hay suppliers, and a steady flow of potential buyers already

[*22] flocked to the area to the various other farms. The Metzes felt that SMF would be uniquely positioned there as the only Straight Egyptian breeding program. Indeed, the Metzes certainly saw significantly more visitors at the farm after the move.

The moves, however, didn't stop the operating losses. The Metzes bought two properties for SMF in the Santa Ynez Valley: Happy Canyon for $3.25 million in 2002 and a small ranch on Edison Street for $1.3 million in January 2003. The Metzes thought Edison Street would be a transitional farm until they could develop Happy Canyon. The Metzes foresaw Happy Canyon as an opportunity to expand the size of their herd without the associated feeding costs because it had an irrigated four-pasture system (and as a place where they could live and farm on the same property). Their development plans, however, never materialized. Burdensome governmental regulations combined with a steep increase in the cost of building materials because of Hurricane Katrina and the Iraq War caused the Metzes to abandon the project after about two years of trying to get it going. And although they sold the property for about $5 million in 2006, they didn't net a profit from the sale after accounting for their development costs. The Metzes did continue to use the Edison Street facility for SMF's activities.

[*23] Between 1999 and 2009 (the latter six years are at issue),[7] SMF continued to

burn through millions of dollars:

| Item | Ordinary income (loss) | Section 1231 gain (loss) | LT capital gain (loss) | Capital contributions (distribution) | Shareholder loans (repayments) |
|---|---|---|---|---|---|
| 1999 | ($1,172,178) | $2,693 | -0- | $1,014,000 | -0- |
| 2000 | (1,488,829) | -0- | -0- | 1,381,917 | $28,309 |
| 2001 | (1,764,339) | -0- | -0- | 1,375,805 | 30,590 |
| 2002 | (1,694,623) | 489,763 | -0- | 777,295 | 134,824 |
| 2003 | (1,249,346) | -0- | -0- | 253,117 | 443,614 |
| 2004 | (1,286,299) | [1]2,235,705 | [1]$953,797 | 2,070,939 | (2,131,372) |
| 2005 | (1,321,730) | -0- | -0- | 1,756,157 | -0- |
| 2006 | (1,346,646) | 210,983 | 8,443 | (2,383,802) | -0- |
| 2007 | (1,308,333) | 193,716 | -0- | -0- | 1,197,228 |
| 2008 | (1,194,303) | 23,232 | -0- | -0- | 1,164,705 |
| 2009 | (753,766) | 32,287 | -0- | -0- | 625,842 |
| Total | (14,580,392) | 3,188,379 | 962,240 | 6,245,428 | 1,493,740 |

[1] The entire section 1231 and long-term capital gain in 2004 arose from the sale of the Naples farm.

With the exception of 2004 when the Metzes sold the Naples property, SMF has

never had a profitable year between 1991 and 2009. Even taking into account that

sale, SMF averaged over a $900,000 annual loss between 1999 and 2009. And

---

[7] Neither party could locate a copy of any corporate tax return for SMF before 1999.

[*24] while the Morgan investment account had been providing the Metzes with the necessary cashflow for SMF's operations, the market crash completely wiped that out in 2008 and left them without a source of external funding.

The Metzes did not give up. After securing a $1 million credit facility from JP Morgan in 2007, the Metzes took out another $1 million credit line from Morgan to cover SMF's operating losses in 2008 (the entire $2 million secured by their personal residence). Also after the market crash they took out an additional $500,000 line from a local lender to sustain the farm's operations. And Christie indicated that they're willing to continue to further borrow against their property if SMF needs to.

At trial the Metzes remained optimistic about SMF's future. They credibly testified that since 2008 they have significantly diminished their expenses and increased revenue. The 2009 return--the last year in the record--supports that testimony. The Metzes also provided credible evidence that showed that they achieved a profit for the first six months of 2011, buoyed by selling five horses at an average price exceeding $70,000--all to foreign buyers. After those sales, the Metzes still owned 31 horses (10 male). While horse sales provide the primary source of revenue, SMF also continued to generate income from stallion services.

**[*25]** And beginning in 2011 SMF began providing horse brokerage and consulting services using the contacts that the Metzes made in the Middle East.

D.    Procedural Background

The persistent losses from 2004 through 2009 were too large for the Commissioner to ignore. He first audited SMF's 2005 return and saw a potential section 183 hobby-loss issue. He expanded the audit to 2004 and 2006 and then to 2007 through 2009 for SMF, and that led him to the Metzes' individual returns from 2004-2009. In May 2010, the Commissioner issued a notice of deficiency for tax years 2004 through 2007 to the Metzes that disallowed the passthrough losses from SMF, as well as related net-operating-loss carryforwards. He also disallowed amounts that the Metzes had reported as investment interest, and determined that the Metzes had failed to report income from the sale of their Naples farm (which the Metzes concede), and that they were liable for an accuracy-related penalty for that failure (which they do not). In 2011, the IRS issued additional deficiency notices to the Metzes for tax years 2008 and 2009, disallowing SMF's pass-through losses, the net-operating-loss carryforwards, and investment-interest deductions. The Metzes filed timely petitions, and we consolidated their cases for trial. (They were California residents when they filed their petitions and remain so today.)

[*26] Three main questions remain:

- Did the Metzes operate SMF with the intention to make a profit?

- Was the interest paid to JP Morgan investment interest?

- Does the Metzes' failure to report the income from the sale of the Naples farm in 2004 subject them to an accuracy-related penalty?

We start with the big one.

II.    Metzes' Motivation in Running SMF

While we organize our analysis by the nine factors listed in the regulation,[8]

see sec. 1.183-2(b), Income Tax Regs., we don't use a reasonable-person standard

or substitute our own business judgment for what the Metzes could have done

better.  Our focus is instead on the Metzes' subjective intent and we use the factors

to establish that intent.  Wolf, 4 F.3d at 713.

A.    Manner in Which the Activity Is Conducted

Taxpayers operate in a businesslike manner when, among other things, they

have a business plan, advertise goods or services, keep complete records, and

respond to losses by changing what they do.  See Engdahl v. Commissioner, 72

T.C. 659, 666-67 (1979); Rinehart v. Commissioner, T.C. Memo. 2002-9, 2002

WL 23954, at *7.  In other words, it's helpful for taxpayers if they carry on an

_____

[8] While the factors aren't exclusive, the parties have not raised any others to add to the list.

[*27] activity in a manner substantially similar to other activities of the same nature which are profitable. See sec 1.183-2(b)(1), Income Tax Regs. We find that there are many objective criteria that indicate the Metzes ran SMF with the intent to make a profit.

Records

First, the Metzes kept records in a businesslike manner. The Metzes used Quickbooks for their bookkeeping and hired a CPA firm to perform monthly bank reconciliations, accounts-payable listings, monthly profit-and-loss statements, workers' compensation payments, and quarterly payroll-tax returns. See Engdahl v. Commissioner, 72 T.C. at 667. Although the Commissioner points out that the Metzes occasionally commingled personal and SMF funds, the Metzes' CPA credibly testified that the Metzes sorted this out on a monthly basis; as part of the reconciliation process, the CPA established a procedure to have the Metzes pay back anything due they owed the corporation.

They also hired a law firm--which Henry understood to have expertise in the horse industry--to prepare written contracts for horse and semen sales. While SMF generally used written sales contracts, Henry credibly testified SMF often prepared bills of sale for its Middle Eastern customers if preferred. The Commissioner points out that some of these breeding and sales contracts weren't

[*28] signed by the buyer, which left SMF potentially unprotected in the event of a breach. This, according to the Commissioner, "is not the kind of problem an intelligent businessperson would leave unaddressed." We keep in mind, however, that we are looking for a profit motive, not "an intelligent businessperson" or even a reasonable person. The Metzes also argue that, especially with customers from a different culture, "pristine perfect preset paperwork" may not always accompany every business transaction. This is especially true in any business, like the Arabian horse business, where there is a third-party registry that will enforce contracts through effective nonjudicial sanctions such as a refusal to record the transfer of ownership to a defaulting buyer. Overall, we find the numerous written contracts (as well as the unwritten ones that were consummated) good evidence that the Metzes engaged in this activity for profit.

The Metzes also made annual sets of alphabetized customer-oriented prospect lists: one for potential horse buyers and one for potential breeding-service customers. They kept good records of when they contacted each customer as well as relevant details of their discussions. The Metzes then sent them promotional materials.

**[*29]**          Business Plans

We have long credited taxpayers who didn't have written business plans and only evidenced their plans through their actions. See Miller v. Commissioner, T.C. Memo. 2008-224, 2008 WL 4449526, at *4; Rinehart, 2002 WL 23954, at *7; Phillips v. Commissioner, T.C. Memo. 1997-128, 1997 WL 105015, at *6. The Metzes went beyond this and had annual written business plans for SMF. SMF's plans included goals, job descriptions, policies and procedures, and descriptions of the farm's individual horses, as well as proposed advertising and promotion opportunities for the upcoming year. The Commissioner argues that these plans lack detailed information on methods to decrease costs or increase revenues. But we think this is his attempt to substitute his own business judgment for the Metzes'. While we don't disagree that it benefits taxpayers to make changes in an attempt to become more profitable, see sec. 1.183-2(b)(1), Income Tax Regs., we don't think such changes necessarily need to be incorporated in a yearly business plan.

The Commissioner also takes great pains to criticize the 2004 mission statement because he argues that its overriding purpose is on breed preservation

[*30] instead of profitmaking.[9] The context matters a great deal. Anita Enander, an expert in the scientific and historical approaches to Arabian horse breeding as well as the Arabian horse business, credibly testified that the perceived over commercialism of Arabian horses prevalent in the '70s and '80s, led even the most successful breeders to play down the commercial aspects of ownership to potential customers. Enander said that breeders began to emphasize that they make decisions, in part, based on what is "best for the horse" or the breed.[10]

### Advertising/Promotion

Another factor showing that the Metzes ran SMF in a businesslike manner is their extensive advertising and promotion. See Engdahl v. Commissioner, 72 T.C. at 667; Miller, 2008 WL 4449526, at *5. The Metzes give a professional-quality

---

[9] SMF's 2004 written mission is to "protect and preserve the straight Egyptian Arabian bloodlines, and improve the purebred Arabian horse through the addition of these bloodlines."

[10] We're also not convinced that a mission statement is the best (or even proper) place to indicate a profit motive. Some very profitable companies tend to claim a nonfinancial focus in their marketing. See, e.g., Google ("to organize the world's information and make it universally accessible and useful"), see About Google, http://www.google.com/intl/en/about/; Nike (to "bring inspiration and innovation to every athlete in the world"); About Nike, Inc., nikeinc.com/pages/about-nike/inc; Starbucks ("[t]o inspire and nurture the human spirit--one person, one cup and one neighborhood at a time"); Our Company: Our Starbucks Mission Statement, www.starbucks.com/about-us/company-information/mission-statement (all last visited January 2015).

[*31] presentation folder to all prospective customers (whether at the farm, during conventions, or sent overseas). The folder contains business cards, professionally prepared stallion cards,[11] and copies of articles featuring the Metzes and SMF in trade publications such as Arabian Horse World and Desert Heritage Magazine. The Metzes also advertise extensively in those trade journals.

SMF has a very attractive website. Donna Christine Egan, an expert in marketing, advertising, and promotion in the Arabian horse industry, testified that the Metzes used the industry's best website builder (a competitor of hers) to create a "well-constructed, attractive, and business-like" website that is "competitive with the best in the world visually and is easily navigated." The Metzes use Google analytics to track which pages are most often read as well as the location of visitors. Christie credibly testified that they regularly review the analytics for marketing strategies, promotion, and sales. Indeed, a very high percentage of SMF's contacts came through the website. The website features professionally prepared videos of horses for sale, videos which Egan testified were "equal to the

---

[11] A stallion card is like a baseball card for Arabian horses--though perhaps a bit more glamorous and never accompanied by bubble gum. They usually have a photograph of the stallion on one side and then its pedigree (sort of a batting average for horses) on the back.

[*32] best internationally." The Commissioner even concedes that the website and advertising campaign "might indicate a global profit motive."

### Horse-by-Horse Tracking

The Metzes also point out that the sheer number of horses SMF sold during the years at issue is characteristic of a profit-motivated business. They argue that the willingness to sell horses at various price points (and even giving some away to cut down on feed costs) shows that they are breeders and sellers of fine horses and not just keeping pets. The Metzes did register their horses so that they could be sold, a factor that independently weighs in favor of finding that they carried on SMF in a businesslike manner. See Helmick v. Commissioner, 2009 WL 3012725, at *9; Miller v. Commissioner, 2008 WL 4449526, at *5. Indeed, the Metzes did sell dozens of horses between 2004 and 2009. And some of those horses sold for six figures, even up to $250,000.

The Commissioner argues that horse sales (or the sale price) aren't relevant without considering the expenses the Metzes incurred in acquiring and maintaining the horses. The Commissioner says that tracking expenses on a horse-by-horse basis would reveal that SMF could never realistically make a profit. And

**[*33]** the Metzes admit they did not track their expenses on a horse-by-horse

basis.[12]  The Commissioner argues that this is a "clear indication that SMF's

---

[12] Henry testified that they take SMF's monthly costs and divide them by the number of horses.  Christie estimated that, at the time of trial, it cost approximately $5,000-$6,000 per year to keep a horse, but admitted that the costs are "variable" and were "probably [a] little bit more than that" during the years at issue.  The Commissioner purports to disavow this estimate by performing his own calculations, stating that "an approximate cost of carry can be gleaned from the record."  By dividing SMF's expenses (excluding depreciation) by the number of horses in inventory, the Commissioner finds that *the average total cost* per horse was between $20,000 and $30,000 per year.  Based on this higher average total cost, the Commissioner says that some horses that the Metzes thought they sold for a profit were actually sold for "a substantial economic loss."  That's not quite the right analysis:  The Commissioner uses average total cost without at all considering the *marginal cost* of carrying an additional horse.  Marginal cost is the "increase to total cost that occurs as a result of producing one additional unit of output" (e.g. bedding, food, veterinary-related expenses) whereas average total cost includes both marginal costs and fixed costs, costs that a business "must bear regardless of the amount of output" (e.g., officer salary, taxes and licenses, and utilities). Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 909 (9th Cir. 2008); cf. Philip Areeda & Donald F. Turner, "Predatory Pricing and Related Practice Under Section 2 of the Sherman Act", 88 Harv. L. Rev. 697, 712, 716 (1975) (optimal measure of entity's cost in predatory pricing cases is marginal cost but average variable cost may be good surrogate).  Average total cost declines as fixed costs are spread over a larger number of units, but eventually will rise as marginal costs increase due to the law of diminishing returns.  A proper marginal-cost calculation--as opposed to average total-cost calculation--allows breeders to know their optimum level of production.  For horse breeding, such calculations are not so simple. See, e.g., J. Shannon Neibergs & Richard Thalheimer, An Analysis Of The Economic Efficiency Of Thoroughbred Breeder/Owner Incentive Policies, available at http://ageconsearch.umn.edu/bitstream/20915/1/spneib01.pdf, at 4.  In any event, marginal-cost analysis would appear to be a much better way to evaluate whether an operation has the potential of turning around a losing economic situation.

[*34] books and records fall short of the standards required by section 183." He points to a few cases that he says support the horse-by-horse tracking requirement.

He first cites McKeever v. Commissioner, T.C. Memo. 2000-288, 2000 WL 1297710, at *11, where we found that horse breeders failed to use existing books and records to minimize their expenses or otherwise achieve profitability. It's true that we noted in McKeever that one of the taxpayers testified that she didn't keep written records that provided per-horse information, but she also didn't keep other information--that would help her achieve a profit. Id. And McKeever did cite Steele v. Commissioner, T.C. Memo. 1983-63, 1983 WL 14043 (dog-breeding case where taxpayer owned between seven and ten dogs), for the proposition that "failure to keep track of expenses on a per-animal basis implies lack of a profit motive." McKeever v. Commissioner, 2000 WL 1297710, at *11. McKeever doesn't hold that such a tracking system is a prerequisite to keeping accurate books and records, and we read it only to say that taxpayers must use their books and records to try to achieve profitability. See id. ("Because petitioners failed to use the existing books and records to minimize expenses or otherwise foster profitability, the fact that they maintained records does not indicate that the activity was carried on with a profit motive").

**[\*35]**   The Commissioner also cites <u>Dodge v. Commissioner</u>, T.C. Memo. 1998-89, 1998 WL 88175, at \*4, <u>aff'd without published opinion</u>, 188 F. 3d 507 (6th Cir. 1999), to argue that without individual records for each horse there is no way to know which horses are more profitable and which training regimens are most successful in increasing each horse's profitability.  The Commissioner asserts, in other words, that the lack of individualized records shows a lack of profit motive. <u>Dodge</u> just doesn't go that far; we held there only that the "lack of *any* detailed records as to which activity on the horse farm was profitable is an indication that the horse-breeding activity was not carried on for profit."  <u>Id.</u> (emphasis added). While <u>Dodge</u> did note the lack of records kept for each individual horse, we were more concerned with this in light of the unique facts of the case--that the taxpayers didn't separate their horse-related expenses from their expenses of raising steers on the same farm.  <u>Id.</u>  Therefore, SMF's activities are factually distinguishable from the farm activities in <u>Dodge</u>.

A case that the Commissioner fails to cite, however, puts to rest any notion that we require a horse-by-horse breakdown to indicate a profit motive.  In <u>Dennis v. Commissioner</u>, T.C. Memo. 2010-216, 2010 WL 3981730, at \*8, the Commissioner contended that the taxpayers didn't keep the necessary records to implement a cost-saving strategy because they didn't record their expenses on a

**[\*36]** per-horse basis. We flatly rejected that contention. Even without the horse-by-horse breakdown, we were "satisfied that the records were adequate to keep track of the activity." Id. We specifically said that the taxpayers' "rudimentary record system allowed them to assess their horse breeding activity's economic performance and identify any cost-reducing strategy." Id.

That approach from Dennis shows that we should be wary of culling from our herd of horse-breeding cases any hard and fast rules in our search for a taxpayer's subjective profit motive. We shouldn't turn what the Commissioner may think a better strategy for cutting costs into a requirement that taxpayers must show they meet before we can find they intended to make a profit. But Dennis does confirm that taxpayers need to do more than just keep records to indicate a profit motive; they also need to use those records in an attempt to improve financial results. Did the Metzes do that?

We find they did. We first find that the monthly Quickbooks reports that the CPA firm produced allowed them to properly assess economic performance and identify cost-reducing strategies. See id. Those records were far more organized than others we have found adequate for section 183 purposes. See, e.g., Helmick v. Commissioner, 2009 WL 3012725, at \*8 (noting that while taxpayers "kept records in an unprofessional and disorganized manner that would have

[*37] satisfied no prospective investor," they "w[ere] not seeking or accounting to any investor" and the records "w[ere] enough to know that the business was not turning a profit"). And Henry credibly testified that he and Christie reviewed those reports "on a monthly basis" to identify monthly cost increases and "get the detail on and get [their] arms around it" to see what they could do to change it. And while Christie admitted that they don't track this on a horse-by-horse basis, she credibly testified that those monthly reports allowed them to figure out an average per-horse cost. See Phillips v. Commissioner, 1997 WL 105015, at *6-*7 (crediting taxpayer's testimony (without written records) that she calculated cost of horse activity on a per-horse basis in the face of Commissioner's contention that taxpayers never calculated such cost). Our own review of those Quickbooks records supports that testimony.

While this may not be enough to satisfy a venture capitalist or investors in a company trying to go public, the Metzes weren't seeking investors for an additional capital infusion. The records the Metzes kept did allow them to assess SMF's economic performance and identify strategies to reduce its costs. And we won't use those records to second-guess what they could've done better; we use them only to determine whether what the Metzes did do at SMF shows that they had a profit motive. We find that these records do show that they did.

**[*38]**     <u>Change of Operating Methods and Adoption of New Techniques</u>

We also find that the Metzes haven't just sat idly while their losses mounted. They've made changes in an effort to improve profits. Most notably, after the string of annual losses in the late '90s and early 2000s, the Metzes decided against staying in retiree-friendly Naples for their golden years. And they didn't just move to another location in Florida but to one almost three thousand miles away in the Valley of the Arabian Horse. They decided to make that move because of the increased foot traffic, the excellent vet clinic, and the lower costs of supporting their herd where there were competing and readily available suppliers. And in 2004 the Metzes created a detailed spreadsheet comparing the various expenses between the first year in Santa Ynez and the last year in Naples that reflected those cost savings. This move shows the Metzes had a serious profit motive for SMF.

The Metzes also responded to the increasing interest in the Arabian horse market from the Middle East. The Metzes observed that the export market for higher-priced Arabians had increasingly migrated abroad, and they have tried to meet some of that demand. Beginning in 2008 the Metzes made five trips outside of the United States (mostly to the Middle East) to network at large shows to generate sales. And those "relational assets" the Metzes developed paid off during

[*39] the year of trial.  The five horses they sold in 2011--at an average price of over $70,000 per horse--were all to foreigners.[13]

While we don't doubt that Metzes could have operated SMF more efficiently, that's not what this factor asks.  Rather, by looking at criteria such as business plans, advertising, records, and response to losses, we must determine whether the Metzes operated SMF in a businesslike manner.  We find on balance that they have and agree with the experts who testified the Metzes carried on SMF in a manner substantially similar to successful horse breeders.  See sec. 1.183-2(b)(1), Income Tax Regs.  Therefore, this factor weighs in their favor.

B.  Expertise of Taxpayers or Advisers

"Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices."  Sec. 1.183-2(b)(2). Over the years the Metzes have shown a dedication to learning from experts in the

---

[13] Although 2011 is outside of the years at issue, it's still informative.  The regulations require us to look at "all facts and circumstances," and so we take note of the Metzes' recent overall trend towards profitability.  Sec. 1.183-2(b), Income Tax Regs.; see Regan v. Commissioner, T.C. Memo. 1979-340 n.6 ("We think that such evidence constitutes one of the 'surrounding facts and circumstances' which must be accorded the appropriate weight in determining whether the taxpayer engaged in the activity with the intent to earn a profit.")

[*40] Arabian horse business, and they themselves have demonstrated their expertise through education and leadership in the industry.

Henry was elected in 2000 to AHRA's board of directors, and one of his first tasks was to form a committee with two of the other directors that engaged in merger talks with the then-failing International Arabian Horse Association. In addition to the merger talks with IAHA, Henry and the other two directors were charged with creating "a strong market development and promotional program for the benefit of the purebred Arabian horse." Henry has also been the president of the Pyramid Society since 2005, a society dedicated to the art of breeding Egyptian Arabian horses. Henry's involvement in the more successful of the two U.S. trade organizations (as well as his diligent work on AHRA's merger with IAHA) leads us to conclude that he not only had knowledge of the Arabian horse market, but was also recognized within the industry as a businessman who had the skills to turn around not just his own farm but a very troubled Arabian horse industry.

Christie has shown similar knowledge and leadership in the industry. She had already served 12 years on the Pyramid Society board before Henry joined her, and she's also been a trustee of the society and president of the Pyramid Foundation. Christie was also a member of the speakers bureau for the Pyramid

[*41] Foundation. In addition to these leadership roles, Christie herself has developed a sophisticated understanding of "strain theory" and various strains within the Arabian breed.[14] She has studied horse bloodlines and pedigrees, and the management and veterinary care of horses. She was (and remains) a speaker at events important to those in the industry; she's also been interviewed by the likes of Arabian Horse World and published articles about her multigenerational-breeding program. Even the Commissioner admitted "that since the formation of SMF * * * Christie Metz has become highly knowledgeable about the scientific, technical and aesthetic aspects of breeding Arabian horses."

But experts start as novices. To gain such knowledge and expertise the Metzes turned to a number of advisors, experts, and industry friends along the way. From the beginning the Metzes sought mentors in the Arabian horse world. At the beginning that included Judy Jones and her husband, Dr. Charles Jones of Atala Arabian Farm. Later the Metzes also sought guidance from Don and Judy Forbis of the Ansata Nile Pharaoh Farm on breeding and Douglas and Margaret Marshall of Glen Lock Farm. Christie credibly testified that the Forbises are in

---

[14] As Anita Enander credibly testified, "strain theory," though still debated, essentially posits that certain phenotypic characteristics are associated with certain strains. The theory itself may be controversial, but the impact of the theory is not. Breeders are expected to be "conversant about the archetypal 'look' of various strains." SMF market materials incorporate strain information.

[*42] some sense responsible for sustaining the Arabian horse market in the United States through its toughest times--the Forbises founded the Pyramid Society, and have written numerous books on Straight Egyptians and their bloodlines across the world. All of these mentors guided the Metzes by introducing them to the industry's economics, and helped them navigate the sometimes aggressive bargaining (particularly at the expense of newcomers) that one might expect in a business that gave English the phrase "horse trading."[15]

The Metzes also turned to a number of professionals to handle aspects of horse breeding that were not part of their expertise. When facing fertility problems with one of their horses, Ansata Nile Pharaoh, the Metzes turned to veterinarian Dr. Ed Squires, who has himself published extensively in the field of horse breeding. Dr. Squires performed tests on the stallion's semen samples. The tests showed that the horse was extremely subfertile, which caused the Metzes to sell him at a loss. In addition, two of their mares suffered from laminitis, or "founder," a condition that can lead to the separation of foot from hoof. They consulted with Dr. Ric Redden, both a veterinarian and farrier (the equine analog of a cobbler), who advised the Metzes and thus prevented the untimely and costly

---

[15] As Christie Metz noted, "[At my first horse show Judy Jones] only let me sit with them because she didn't trust anybody else near me. * * * There's a horse trader in every business, isn't there?" The adage is true, even in horse trading.

[*43] death of two mares. The Metzes also consulted with Dr. Ginger Rich and Bruce Clark regarding equine nutrition and more economical hay supplies from a local farm.

At Arabian horse shows the Metzes hired professionals to show their horses. At the 2005 Egyptian Event, an important trade show for the industry,[16] the Metzes hired Michael Bayatt, a professional horseman recognized as a leading handler of horses, to show Majestic Noble SMF. The Metzes also retained Graydon Head and the Ritchey Law Firm in Cincinnati to draft farm contracts for sales, training, and boarding. SMF used professional CPA accounting firms all during the tax years at issue, and kept monthly and yearly reports on hand to track income and expenses.

The question remains whether the Metzes' own expertise and that of their advisors pushes this factor in their favor. "For purposes of analyzing a case under section 183," the Commissioner argues, "the courts distinguished technical expertise with respect to breeding, promoting and showing horses from expertise

---

[16] At trial Donna Egan, an expert on Arabian horse marketing, advertising, and promotion, testified that the Egyptian Event, held each year in Lexington, Kentucky, is "the premier show for Egyptian Arabian Horses in the world today * * *. People come from all over the world to see pure bred Straight Egyptian Arabian Horses at this event, and it is a premier marketing and presentation time, and also a time for people to network and to get to know their potential customers."

[*44] in the economics of those undertakings."  The Commissioner cites Burger v. Commissioner, 809 F.2d 355 (7th Cir. 1987), aff'g T.C. Memo. 1985-523, and Smith v. Commissioner, T.C. Memo. 1997-503, aff'd without published opinion, 182 F.3d 927 (9th Cir. 1999).  We think these cases are distinguishable, however.  In Burger, we found for the Commissioner on the matter of expertise because the taxpayer did not consult anyone regarding the economics of dog breeding.  Burger, 809 F.2d at 359.  We think this means that knowledge of the activity itself apart from its economics is not enough to clear the hurdle:  A taxpayer must demonstrate expertise and attempts to improve results in a money-losing business.

The Metzes plainly meet that requirement.  They moved their operation, through consultation with Bruce Clark acquired local feed (a huge cost) at a lower price, and unlike the dog breeder in Burger, kept businesslike records.  In Burger the taxpayer kept records on only a yearly basis and from that we concluded "that because the taxpayers had no system to monitor expenses or losses, the petitioners could not make informed business decisions."  Id.  That just isn't the case here.[17]

_____

[17] Smith is distinguishable on similar grounds.  In Smith, the taxpayer was a medical doctor who attended veterinarian seminars for dog breeders.  We held that even if Smith was "skilled in the art of dog breeding," he was not an expert in the dog-breeding business, and his failure to seek professional economic or accounting advice, along with sparse business records, swung this factor in the Commissioner's favor.  Smith v. Commissioner, T.C. Memo. 1997-503, 1997 WL

(continued...)

**[\*45]** The Commissioner also makes a great deal of fuss about a lack of a comprehensive market analysis. We aren't persuaded that this is such a big deal. In Engdahl v. Commissioner, 72 T.C. at 668, with facts very similar to those presented here, we noted: "While no formal market study of the market for American saddle-bred was conducted, we believe that petitioners' informal and continuous consultations with veterinarians, their trainer, and other horse breeders who are knowledgeable in this area demonstrates an intent to engage in a horse breeding business for profit."

Even aside from such considerations, the Commissioner's argument that the Metzes' expertise regarding breeding, genetics, veterinary care, equine nutrition, and aesthetic quality of the Arabian horse does not bear on this factor is wrong. The parties in these cases faced a Court with absolutely no expertise or knowledge about the Arabian horse industry; but all the major witnesses left us with the firm conviction that knowledge of the quality of a strain, its phenotypic characteristics, its proper nutrition, even how to speak in the sometimes esoteric language of "dish faces" and "fountain-like tails," and its sometimes ribald dialect of "stallion milking" and "tease mares"--and not just to joke about them but to explain them

---

[17](...continued)
695369, at \*5, aff'd, 182 F.3d 927 (9th Cir. 1999).

[*46] intelligibly--do materially affect the economics of a horse farm.  Customers of SMF and other Arabian horse farms care very deeply about the lineage, care, and appearance of these horses, and the better SMF is at producing horses of top quality, the more customers they will have and the higher the price their horses can command on what has become an international market.  As SMF's owners got better at breeding top horses, they would expect to see their revenues increase.  To suggest otherwise disregards the nature of the business.  This kind of expertise very much bears on the economic success of SMF.  We find this factor weighs in favor of the Metzes.

### C.    Time and Effort Expended on the Activity

The more time a taxpayer spends on an activity, the less it looks like a hobby and the more it looks like a business engaged in for profit.  The regulations provide two important principles:  First, the more time a taxpayer spends in an activity that gives him little personal pleasure or recreational enjoyment, the more likely it is that he intends turn a profit; and second, where a taxpayer leaves another job to spend most of his time on the activity that may be evidence of an intention to turn a profit.  See sec. 1.183-2(b)(3), Income Tax Regs.

Henry and Christie Metz worked full time at SMF for the years at issue, except for a time in 2006 when Christie did not work at all due to suffering from a

**[\*47]** blood disease that she contracted in Egypt. The Metzes contend that there is no Tax Court case that has ever held that a full-time activity of both taxpayers fails the section 183 test. The Commissioner answers with Mitchell v. Commissioner, T.C. Memo. 2001-269, 2001 WL 1196204. In Mitchell, the taxpayer owned a tree farm and also had an accounting and legal practice. Id., 2001 WL 1196204, at \*2. While the taxpayer did work on the farm upwards of 40 hours per week from mid-April through September (the rest of the year he focused on his accounting and legal practices), we still found that his level of activity amounted to this factor being "neutral." The reason is simple: "[Mitchell] did not explain how the work he performed [on the farm] related to making a profit." Id. at \*4.

There are many reasons to distinguish the Metzes' activity from the facts in Mitchell,[18] but it is enough that we note this: Henry and Christie worked regularly and continuously throughout the years at issue and have shown that their activities were related to making a profit. Even if we were persuaded by the

---

[18] For example, in Mitchell, the taxpayer worked only part of the year on his tree farm, which often amounted to little more than clearing brush and maintaining the grounds; the farm never had any income, much less any profit; he never acquired any kind of particular expertise in running a tree farm, and his knowledge was limited to a general understanding of how a farm works by having grown up on one. Profit in Mitchell shimmered only in the distant future: e.g. the white oak would require 50-70 years before being harvestable; the walnut would require 30 years. Mitchell, 2001 WL 1196204, at \*2.

**[\*48]** Commissioner's reading of <u>Mitchell</u>, at a bare minimum this factor should be neutral, but it's not. Henry and Christie have shown that their management and development of SMF has been aimed at breeding horses to sell, and they've worked personally and with great effort. We therefore find that this factor weighs in favor of the Metzes.

    D.    <u>Expectation That Assets Used in Activity May Appreciate in Value</u>

The next factor on our list is the expectation that the assets used in the Metzes' activity may appreciate in value--this makes sense in a world where income can be capital as well as ordinary. But there's a somewhat complicated issue that we have to analyze here before we can make a finding about this factor: what is an "activity"? The Metzes raised horses on their farm, and they also owned farm land. The question then is whether the activity of owning the land may be included with the activity of raising the horses. We find that it should.

Under section 1.183-1(d)(1) of the regulations, we must examine the facts and circumstances to determine whether two or more undertakings are a single "activity." "[T]he most significant facts and circumstances * * * are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment

**[\*49]** setting, and the similarity of various undertakings." Sec. 1.183-1(d)(1), Income Tax Regs. The Commissioner, however, points us to another part of the rule: "[w]here land is purchased or held *primarily* with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value." Id. (emphasis added).[19] This rule doesn't apply to the present case.

The Metzes didn't purchase the Florida or California properties *primarily* with the intent to profit from the increase in their values. On the contrary, the record clearly establishes that the Metzes moved to Florida and bought the Naples property to move their farming operation down there. The Commissioner notes that the Metzes also "acquired and held the [Florida property] for its potential appreciation." Even if true, the observation misses the point. The Commissioner makes the leap from saying that the Florida property was purchased for the dual

---

[19] The regulation is clear that appreciation in land must be the "primary" purpose for holding the land before there can be any discussion of whether the farming activity reduces the cost of carrying the land for its appreciated value. See Engdahl v. Commissioner, 72 T.C. 659, 668 n.4 (1979); Perry v. Commissioner, T.C. Memo. 1997-417, 1997 WL 578793, at 8. But see, e.g., Sanders v. Commissioner, T.C. Memo. 1999-208, 1999 WL 416975, at \*9 (no mention of "primary").

[*50] purpose of horse farming and capital gain to saying that the land's potential appreciation was the primary reason for the Metzes' purchase of the property. The record doesn't support this claim. The same holds true for the Metzes' properties in California.

Which leaves us to decide whether the Metzes' land holding and horse husbandry have enough of an organizational or economic interrelationship. We think they do. We follow our reasoning in Engdahl v. Commissioner, 72 T.C. at 668 n.4: "Petitioners purchased the Morgan Hill property primarily for the purpose of breeding, raising and selling horses. Thus, the holding of the land and the horse-related activities are considered a single activity." Same here. When the Metzes moved, they sold the Florida property and replaced it with California property. We're convinced that they bought and held them in connection with the operation of their horse farm, and find that their land ownership and horse breeding constitute one "activity" for purposes of section 183.

We still have to decide whether the Metzes expected their assets to appreciate in value and, if so, how that bears on inquiry into their subjective intent in continuing SMF in the face of continued losses in the years at issue. There are at least three potential assets that we need to consider: the land; the horses; and the fresh-squeezed, chilled, and frozen horse fluids. On the issue of land, the

[*51] Commissioner summarizes and estimates that, in a light favorable to the Metzes, the total actual and potential appreciation in the one Florida property and two California properties totals $4.4 million. When it comes to the horses, the Commissioner first estimated an overall appreciation in SMF's herd to be $1.5 million, but then allowed for the possibility that the herd has appreciated by $1.6 million. Rounding out the picture, the horse fluids are estimated to be worth just shy of $500,000. The source of these valuations is the expert-witness report of Scott Benjamin. We are satisfied that the expert report is thorough enough, along with the rest of the record and exhibits, to provide a reasonable basis for valuing SMF's assets. (This report is helpful in determining the issue of asset valuations and appreciations. See generally Rule 143(g); Fed. R. Evid. 702; Crimi v. Commissioner, T.C. Memo. 2013-51). The Commissioner rejects these valuations, but offers no contradictory expert testimony. In sum then, the total appreciation of SMF's assets comes to about $6.5 million. This may not be enough to make up for the losses that the Metzes have already suffered, as the Commissioner argues--but that's not the point. This factor is on the list because taxpayers who buy or grow assets that they actually and honestly think (and especially if they reasonably think) will increase in value are more likely to have the subjective profit motive that we have to look for.

[*52] This factor therefore weighs in the Metzes' favor.

  E. Success of Taxpayers in Carrying On Other Similar or Dissimilar Activities

As the Commissioner concedes, Henry "can be presumed to have first-hand knowledge of the importance of budgets, forecasts, profitability targets, and other devices that are regularly used to chart a successful business course." Henry did, after all, help turn Metz Baking from a business that lost about $1 million a year into one that was profitable enough to draw corporate suitors. This experience fits well within section 1.183-2(b)(5), Income Tax Regs. This fifth factor puts particular emphasis on experience "converting [activities] from unprofitable to profitable enterprises." Business acumen and the ability to develop and improve a business counts for this factor. Henry had such experience, and so we find that this factor weighs in the Metzes' favor.

  F. History of Income or Losses With Respect to the Activity

Long periods of sustained and heavy losses may suggest the activity is a hobby and not entered into for profit. See sec. 1.183-2(b)(6), Income Tax Regs. For the years at issue SMF sustained on average losses of around $1 million each year (excluding 2004 when they sold their Florida property). What's more, the Metzes started their horse farm in 1991, and these losses are outside of the

[*53] recognized 5 to 10 year "start-up period" during which losses are generally more common. See Engdahl, 72 T.C. at 669. At first blush, this factor seems like a clearcut win for the Commissioner.

The regulations do, however, provide guidance in how to appraise circumstances outside of the taxpayer's control. As the regulations read: "[W]here losses continue to be sustained beyond the [startup] period such continued losses, *if not explainable*, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit." Sec. 1.183-2(b)(6), Income Tax Regs. (emphasis added). The regulations themselves point to a number of reasons why a business may sustain losses but nonetheless be a profit-motivated business, and one very important one is all over these cases: depressed market conditions. Id.

The Metzes explain, at great length and very convincingly, that this is just what happened to them. Some of their problems were industrywide, and some were specific to SMF. As we've already described, the Arabian horse market has had a lot of problems during the last two decades; by all accounts the last 20 years have been a bit of a nightmare for those in the industry. The expulsion of the Arabian Horse Registry of America from the World Arabian Horse Organization prevented American Arabian horse farms from marketing their horses to the world.

**[*54]** Even after the AHRA was let back into the herd in 2008 things did not drastically improve; the bottom fell out of the economy that fall, and the Great Recession depressed the demand for luxury goods worldwide.

While these circumstances affected SMF like any other Arabian horse farm, the Metzes had their own particular problems. The veterinary services of their equine medical clinic turned out to be unexpectedly substandard (which resulted in fewer foals than reasonably expected); two of SMF's mares foundered (essentially losing a hoof) and were thereafter only able to breed through a more intensive and expensive technique that required embryo transfers; a statistically significantly higher proportion than normal of colts to fillies were born, which held back SMF's future breeding plans; and a stallion that the Metzes thought was excellent breeding stock turned out to be subfertile.

This series of unfortunate events goes a long way to explain why SMF kept losing money, and we think it cuts against this factor's being one that clearly favors the Commissioner. The Commissioner, however, makes one argument we must confront--what is the "profit" in the "profit motive" whose existence we're searching for? The Commissioner argues that "petitioners' activity can only be considered to be a for-profit activity if petitioners have a *bona fide* expectation that the amount of the future profit will more than offset the $20 million of losses

[*55] incurred from inception to date." We disagree--this argument "distorts the notion of profit motive for purposes of section 183." Helmick v. Commissioner, 2009 WL 3012725, at *10 (the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years (citing and discussing Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 253 (2d Cir. 1967))). We continue to agree with our interpretation of Bessenyey in Helmick and hold that the Metzes "meet their burden as to any year for which they show that they expected eventually to recoup losses sustained in the 'intervening years' * * * between the current year and the hope-for profitable future." Id. This is to say that if a taxpayer can expect to generate an overall profit from the current year onward, then it can't be said that he lacks a profit objective simply because he will never generate an overall profit over the lifetime of the activity. We're convinced that at the time of their move to California in 2003, the Metzes expected to generate an overall profit in the coming years. The move itself was predicated on decreasing costs and increasing income, and SMF has generally trended that way since the move (with a profit showing for the first half of 2011). So while SMF's losses during the years at issue certainly

[*56] don't weigh in their favor, the Metzes have a reasonable explanation. This factor is neutral.

### G. Amount of Occasional Profits, If Any, From the Activity

Occasional profits may help a taxpayer show he intended to make a profit, but the size of profits relative to losses and the frequency of those profits are important. In addition, "an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasionally small profits are actually generated." Sec. 1.183-2(b)(7), Income Tax Regs. This factor proves a pickle. In analyzing it we must remember that the sale of the horse farm in Florida is considered part of the Metzes' horse-farming activity. See generally Engdahl v. Commissioner, 72 T.C. at 668 n.4; sec.1.183-1(d)(1), Income Tax Regs.

The losses in 2005 through 2009 were not "small", but then again, neither was the profit in 2004. The two scenarios laid out in the regulations (occasional small profit with regular large losses, or occasional large profit with regular small losses) do not fit the facts of these cases. Here we have one year with a large profit, and the remaining years with large losses. While the two scenarios don't therefore provide much guidance, the possibility of "substantial ultimate profit" can help cut through the fog. Particularly helpful is the regulation's guidance that

**[*57]** "[i]n determining whether such a [profit] objective exists, it may be sufficient that there is a small chance of making a large profit." Sec. 1.183-2(a), Income Tax Regs.

Horse farming is a speculative venture. More horses are duds than champions, but a few do command multimillion-dollar syndication fees. The taxpayers offer the examples of the $6.5 million Ruminaja Ali and other horses named Aladdinn and Khemosabi who commanded more than $5 million each. Everyone understands that the probability of hitting this kind of jackpot is low, but we find that it is not entirely random. To generate good sales a horse farm must take the time needed for a multigenerational-breeding program. A horse farm has to make decisions about its breeding program that hopefully will bear good fruit (or foal) many years later. With such a long time frame, and such a low probability any particular horse will be worth a very great deal, we have to conclude that Arabian horses are very much a speculative business. Even one multimillion-dollar payoff would take care of covering around five years of SMF's average losses, and those losses appear to be trending down. Thus, though SMF may not ultimately breed a stallion such as Ruminaja Ali, the potential for a "substantial ultimate profit" bears on the issue of subjective intent to make a profit. Hoping for a windfall isn't the best business plan, but that's not what we're

[*58] asked to evaluate. We're content acknowledging, as the regulations do, that "an investor * * * who incurs very substantial expenditures is in the venture for profit even though the expectation of a profit might be considered unreasonable." Sec. 1.183-2(a), Income Tax Regs. But we're looking for the Metzes' subjective intent, and find that they actually--perhaps unreasonably, but actually--intended to make a profit.

H.    Financial Status of Taxpayers

Income from other sources may indicate that an activity is not engaged in for profit. Sec. 1.183-2(8), Income Tax Regs. Undoubtedly, up until 2008 (most of the years at issue) the Metzes had substantial income from their JP Morgan account. Income in the form of dividends, capital gains, and interest were in effect "sheltered" by the losses SMF ran during many of the years at issue. This does not close the inquiry. As we noted in Engdahl: "In cases of this kind, the concurrent existence of other income poses the question, rather than answers it." 72 T.C. at 670.

If we were looking only up until 2008 we might be inclined to say this factor favors the Commissioner. But 2008 happened, and it completely changed the Metzes' financial picture. As a result of the margin call on their JP Morgan account, the Metzes were "wiped out," yet they didn't quit the farm. During 2008

[*59] and 2009, despite very few liquid assets, the Metzes continued the horse farm with operating income from the farm and lines of credit.

The Metzes point us to cases, including Phillips v. Commissioner, T.C. Memo. 1997-128, and Hoyle v. Commissioner, T.C. Memo. 1994-592, for the proposition that where investment in an activity is substantial relative to a taxpayer's other income, that investment may indicate a profit motive. The investment of large sums in an activity seems like the kind of objective fact that a taxpayer should be able to use to bolster his claim that he's in it to make a profit. The Metzes invested not only large sums but, after the 2008 call on their JP Morgan account, large percentages of their income in SMF. By the last couple tax years before us, a very large proportion of the Metzes' net worth was roped to SMF. See generally Stephens v. Commissioner, T.C. Memo. 1990-376. We therefore find this factor weighs in favor of the Metzes.

I.      Elements of Personal Pleasure or Recreation

When a taxpayer gets personal pleasure or recreation from an activity it's less likely the activity is engaged in for profit. Sec. 1.183-2(b)(9), Income Tax Regs. But we must be cautious with this factor--there's no requirement in the law that a taxpayer's business expenses are deductible only if incurred in an activity he loathes. "[T]he fact that the taxpayer derives personal pleasure from engaging in

[*60] the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors". Id.

The Metzes definitely take personal satisfaction from their farm, but we believe the Commissioner exaggerates the degree. The Commissioner makes a great deal of two aspects of personal pleasure the Metzes enjoy in owning their farm: trips to horse show events and riding horses. As far as trips to horse show events go, it's not apparent that the Commissioner has offered any way to distinguish those who are in the business of horses and those who just enjoy horses at these shows. We must assume that the Commissioner isn't auditing every horse-farm business whose owners show up at these events. On the contrary, we would expect horse-farm owners to attend these events regularly to meet with those who just enjoy horses. The trial also showed that Christie Metz no longer rides horses, and hasn't done so since 2006.

The Metzes understandably enjoy their work. This doesn't mean they enjoy everything about it, and even if they did, "suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. 312, 317 (1972). Leading a frisky stallion to a "phantom" mare, or presenting a "teasing" mare on the opposite side of a "teasing wall," or physically collecting a stallion's precious

[*61] body fluids are activities both essential to Arabian horse breeding and something no reasonable person could enjoy. We find what elements of personal pleasure exist for the Metzes do not render SMF a hobby because of their enjoyment alone, and mark this factor down as neutral.

J.      Conclusion

With the above factors considered, in light of the record and extent of the Metzes' involvement and time spent working on Silver Maple Farms, we find that the Metzes did have a subjective intent of making a profit.

III.    Investment Interest

Two minor issues remain, and the first is whether the interest that the Metzes paid to JP Morgan during the years at issue is deductible under section 163. The Commissioner has conceded that the Metzes actually paid the interest. The only thing that we must decide is its classification. We first note that the Metzes properly and timely filed a Form 4952 with their 2008 return (a requirement under section 163 to include net capital gains in net investment income). See sec. 1.163(d)-1(b), Income Tax Regs. With that procedural hurdle cleared, we turn to how the loan disbursements from JP Morgan were spent.

As Henry testified, the bulk of the disbursements went to buy securities, and to the extent that happened, the allocated interest qualifies as investment interest.

[*62] Sec. 163(d)(3). JP Morgan also loaned money to the Metzes to buy real estate, both farm property and the real estate used by the Metzes as their home. Since we have already decided that the Metzes had an intent to make a profit and thus that SMF survives as a *bona fide* business, we have no problem saying that interest paid on loans that went to buy business property created deductible business interest under section 163. See sec. 163(h)(2)(A) ("interest paid or accrued on indebtedness properly allocable to a trade or business"). The remaining category, real estate used as a personal residence, qualifies as a "qualified residence" and thus the interest paid is "qualified residence interest." Sec. 163(h)(2)(D), (h)(3)(A), (h)(4)(A). The only restriction on deductibility here applies to the qualified-residence interest. Since the qualified-residence interest is calculated based on the "acquisition indebtedness" needed to finance the purchase of the home, section 163(h)(3)(B) limits the amount of debt used to finance a qualified residence to $1 million for the purposes of computing the deductible interest. Any interest not allocable to the above three categories would not be deductible, but there is no such interest. We therefore find that the interest paid to JP Morgan is deductible, with the $1 million limit on qualified-residence-acquisition indebtedness applying as a limit to the personal-residence portion of the real-estate acquisitions (which means it's at least possible that this will have

**[*63]** computational consequences that we will leave to the parties to try to resolve as part of the Rule 155 process).

IV.   Negligence

The last issue is whether the Metzes' failure to report the sale of their Florida ranch property in 2004 should subject them to an accuracy-related penalty under section 6662(a).  The Commissioner has met his burden of production on this issue by showing that the Metzes' failure to report the Florida property's sale led to a nearly $600,000 understatement of tax.  This amount exceeds 10% of the amount required to be shown on the return, and far eclipses $5,000.  See sec. 6662(d)(1)(A).

The source of this omission is a miscommunication about the ranch's sale when they moved SMF to California.  Up through the date of trial the Metzes retained the Henjes, Conner & Williams (HCW) accounting firm, and had retained them for more than 20 years.  The Metzes also had an in-house accountant in Florida.  But when they moved their operation to California they turned over their Florida accounting records to a Naples, Florida firm because their in-house accountant wasn't moving with them.

The retention of the Naples accountants led to a botched relay of information--that firm sent the proceeds and transaction details from the Florida

[*64] sale to JP Morgan but didn't copy HCW. JP Morgan then applied the proceeds to pay down a chunk of the acquisition indebtedness that SMF had incurred to buy the two parcels of California land.

HCW had standard practices to prepare its clients' tax returns and had followed them faithfully for the Metzes for many years. We believed the Metzes' tax accountant when he testified that his practice was to look at SMF's balance sheet each year and, if there was a change, to ask whether there had been a disposition. In the year of the Metzes' relocation, however, there was land in the balance sheet at the beginning and end of the year. The HCW accountant therefore didn't think to ask about a disposition, and the records of the disposition hadn't made their way to him because they'd been misrouted by the Florida accountants.

The question is whether on these facts the Metzes have established a defense under section 6664(c) by showing that they themselves acted in good faith and had reasonable cause. Proof can come in the form of reliance on professional advice. But there was no advice here--just understandable ignorance on HCW's part.

That leaves the Metzes with having to show that the extent of their effort to assess their tax liability was reasonable "in light of all of the facts and

[*65] circumstances, including the experience, knowledge, and education of the taxpayer" and that they acted in good faith. Sec. 1.6664-4(b), Income Tax Regs. In Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987), we sustained a penalty because the taxpayers omitted dividends from their reported income--even though the accountant who prepared their return was on the corporate board, and had access to the corporate records that accurately showed dividends paid. The Metzes' case is a bit like that, but here we can't even say that the HCW accountant had that level of access.

We have little doubt, however, that the Metzes acted in good faith. They were doing their tax preparation in the same way they had for over 20 years. HCW had faithfully served as their accounting firm for many years, and they had internal controls in place to audit returns for accuracy before those returns were submitted to the IRS. The record also shows that in early 2005 the Metzes were dealing with a number of stressful family issues, and we find that they did not intend to understate the tax due.

The problem for them is whether they acted reasonably under the circumstances. There were certainly miscues in the transmission of important information. But the income omitted was quite large, and the transaction that gave rise to it was by far the largest transaction that SMF had that year. We cannot but

**[\*66]** be sympathetic to the stresses that the Metzes suffered that year--family issues, the time it took to arrange a move across the country, and continuing business reverses--but their stresses that year are similar to those that we and other courts have found do not constitute reasonable cause sufficient to avoid penalties. See, e.g, Odend'hal v. Commissioner, 80 T.C. 588, 618 (1983) (press of business not reasonable cause), aff'd and remanded on other grounds, 748 F.2d 908 (4th Cir. 1984); Henry v. United States, 73 F. Supp. 2d 1303, 1308 (N.D. Fla. 1999) (misunderstanding of filing instructions by comptroller not reasonable cause).

We make a similar finding today, and uphold the disputed penalty on this one item. But since on the other contested issues we find in the Metzes' favor,

Decisions will be entered

under Rule 155.